# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
September 9, 2015 Session

# AMERICAN HERITAGE APARTMENTS, INC. v. THE HAMILTON COUNTY WATER AND WASTEWATER TREATMENT AUTHORITY, HAMILTON COUNTY, TENNESSEE

**Appeal by Permission from the Court of Appeals, Eastern Section**
**Appeal from the Circuit Court for Hamilton County**
**No. 11C1207    Jacqueline Schulten Bolton, Judge**

_____

**No. E2014-00302-SC-R11-CV – Filed April 8, 2016**
_____

We granted permission to appeal to determine whether a customer who seeks to challenge monthly rates charged by its sewer service provider must exhaust administrative remedies before filing suit. The plaintiff apartment complex filed this action individually and as a class representative, arguing that the monthly charge assessed by the defendant water and wastewater treatment authority is unlawful. In response, the defendant asserted that a customer who seeks to dispute the rates charged must first follow the administrative procedures provided in the Utility District Law of 1937, Tennessee Code Annotated sections 7-82-101 to –804 (2015). On this basis, the water and wastewater treatment authority sought dismissal of the lawsuit for failure to exhaust administrative remedies. The trial court dismissed the lawsuit for failure to exhaust administrative remedies, and the Court of Appeals reversed. We hold that the administrative procedures in Part 4 of the Utility District Law of 1937 do not apply to a rate challenge filed by an individual customer against a water and wastewater treatment authority, so we agree with the Court of Appeals that the trial court erred in dismissing the lawsuit for failure to exhaust administrative remedies. We affirm the remainder of the Court of Appeals' decision, except that we vacate the trial court's alternative ruling on class certification and remand that issue to the trial court for reconsideration.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Affirmed in Part and Reversed in Part; Decision of the Circuit Court Vacated in Part; and Case Remanded to the Circuit Court**

HOLLY KIRBY, J., delivered the opinion of the Court, in which SHARON G. LEE, C.J., and CORNELIA A. CLARK and JEFFREY S. BIVINS, JJ., joined.

J. Christopher Clem, Chattanooga, Tennessee, for the appellant, Hamilton County Water and Wastewater Treatment Authority.

Jimmy Fain Rodgers, Jr., Chattanooga, Tennessee; and James G. Stranch, III, J. Gerard Stranch, IV, and Michael G. Stewart, Nashville, Tennessee, for the appellee, American Heritage Apartments, Inc.

## OPINION

### FACTS AND PROCEDURAL HISTORY

### Background

In 1993, Hamilton County authorities needed to provide sewer services to homes and businesses in unincorporated areas of Hamilton County and also in seven surrounding incorporated municipalities: East Ridge, Lakesite, Lookout Mountain, Red Bank, Ridgeside, Signal Mountain, and Soddy-Daisy. To build the needed sewer system, the Hamilton County Commission[1] created a water and wastewater treatment authority (hereinafter "wastewater treatment authority") in accordance with Tennessee Code Annotated sections 68-221-601—618 (2013), known as the Water and Wastewater Treatment Authority Act ("WWTA Act"). The entity it created is the appellant in this action, the Defendant/Appellant Hamilton County Water and Wastewater Treatment Authority ("County Authority"). The sewer systems under the purview of the County Authority are maintained separately from other sewer systems in Hamilton County, specifically those for the City of Chattanooga and the City of Collegedale.

By 2008, the sewer systems in the service areas of the County Authority became unable to process adequately the high influx of storm and rain water. This caused a variety of difficulties.[2] Ultimately, the problem got the attention of the Tennessee

---

[1] The Hamilton County Commission operates the government of Hamilton County.

[2] For example, the high influx of storm or rain water prevented the sewage from being effectively treated prior to being discharged into the Tennessee River; caused sewage to overflow into neighborhoods' storm water ditches, creeks, and streams; reduced the sewer system capacity for new

Department of Environment and Conservation (TDEC), which concluded that the inability to process the storm and rain water violated various TDEC requirements. On March 20, 2008, TDEC issued an order ("TDEC order") concluding that the County Authority had violated TDEC requirements.[3] TDEC directed the County Authority to develop a program to prevent storm water from entering or infiltrating the sewer system in Hamilton County. More specifically, the TDEC order required the County Authority to, among other things, (1) develop a Corrective Action Plan/Engineering Report to optimize and document maximum "Infiltration & Inflow" removal, (2) implement a sewer overflow response plan, and (3) develop a plan to prevent the infiltration of storm water throughout the entire County Authority sewage system. TDEC prohibited the County WWTA from connecting new customers on Signal Mountain until it addressed certain problems raised in the TDEC Order.

To comply with the TDEC order, the County Authority implemented several strategies. These strategies included an ambitious program called the Private Service Lateral Program ("the Program"). The aim of the Program was to repair and refurbish all of the pieces of pipe that connect private properties to county-owned sewer lines; the pieces of pipe are referred to as either "sewer laterals" or "private sewer service laterals."[4] To accomplish this, the Program outlined plans to have all 26,000 of the private service laterals in the service area inspected and repaired or replaced as necessary.

To cover the cost of the Program, the County Authority voted to authorize a flat-rate monthly fee of $8 per unit (the "$8 Charge") for all of its customers. The $8 Charge would appear as a separate monthly fee on customers' water bills for a period of twenty years.[5] The County Authority incorporated the $8 Charge into its Sewer Use Rules and

---

connections and the expansion of existing customers; and increased the cost to treat what is mostly clean storm water.

[3] The Commissioner of TDEC has the authority to issue a complaint when he has reason to believe that there has been a violation of the Water Quality Control Act of 1977, Tennessee Code Annotated section 69-3-101 to –69-3-148 (2012). The Commissioner may also order that corrective action be taken. Tenn. Code Ann. § 69-3-109(a) (2012).

[4] According to the complaint, a "sewer lateral" is a pipe that is "normally four inches (4") in diameter for residential and larger for commercial buildings, which runs underground from the foundation of a home or business and connects to the public sewer main and transports sewage away from a home or business and deposits it into a larger public sewer main."

[5] The County Authority's normal sewer bill varies depending on water usage as that water usage is reported by the private water provider. The County Authority is one of the few sewer utilities that must deal with a private water provider. Larger cities, such as Knoxville, Nashville, and Memphis, all own their water utilities.

Regulations for Wastewater Collection Systems ("the Regulations").[6] TDEC approved the plan, and the Tennessee Attorney General opined that both the plan and its financing were constitutional in Attorney General Opinions 08-143 (Sept. 4, 2008) and 08-185 (Dec. 12, 2008). The County Authority planned to make Signal Mountain and East Ridge the first municipalities in which repairs under the Program were implemented.

In 2010, the County Authority began inspecting its customers' service laterals as a pilot program. See Tenn. Code Ann. § 7-35-401(c)(1)(B)(iii) (2015) (authorizing the County Authority to perform rehabilitative maintenance or construction on private property with owner's consent). The sewer laterals are owned by the owners of the buildings to which they connect. Therefore, prior to performing any work on a customer's service lateral, the County Authority had to obtain consent from the property owner; in the alternative, customers were given the option of making their own repairs to their service laterals at their own expense.

In 2012, to finance the Program, TDEC and the Environmental Protection Agency (EPA) approved a $10 million loan to the County Authority through the EPA Clean Water Loan Program. The $8 Charge billed to County Authority customers was pledged as collateral for the loan and is used to pay the loan premiums.[7]

Plaintiff/Appellant American Heritage Apartments, Inc. ("American Heritage"), is a Tennessee, not-for-profit corporation that operates a low-income, 168-unit apartment complex in East Ridge, Tennessee, one of the incorporated municipalities served by the County Authority. On August 19, 2011, the County Authority sent American Heritage a letter notifying it of the $8-per-unit Charge on its water bill. Based on a 90% occupancy

---

[6] The relevant Regulation states:

A monthly fee in the amount of $8 shall be charged to any and all gravity sewer customers now existing or hereafter becoming customers of the [County Authority] to cover [the County Authority's] cost of the Private Service Lateral Program implemented in accordance with Article VIII F. herein. Said monthly fee shall be for a period of 20 years from the date of implementation of the Private Service Lateral Program. The Board shall have the right to adjust the monthly fee and/or the term of the [Private Service Lateral Program] fee as it deems necessary from time to time.

[7] As a condition of the EPA loan, the County Authority must own the service laterals via an easement, rather than securing consent to work on the service laterals from the property owners. Consequently, since the fall of 2012, the County Authority has been obtaining easements to work on the property owners' service laterals instead of consents. See Tenn. Code Ann. § 7-35-401(c)(1)(B)(i)(b) (2015).

rate, the letter stated, the County Authority would charge American Heritage $8 each for 151 units.  This amounts to $1,208 per month or $14,496 per year; over the 20-year projected life of the Program, the charges would total over $289,000.  The letter explained to American Heritage that the charge would be prospective only, beginning September 1, 2011.  American Heritage objected to the addition of the $8 Charge to its monthly bill, to no avail.  This lawsuit followed.

## Lawsuit

On October 3, 2011, American Heritage filed the instant lawsuit against the County Authority in Hamilton County Circuit Court.  The complaint was filed by American Heritage both individually and as a class action pursuant to Rule 23 of the Tennessee Rules of Civil Procedure.  American Heritage asserted in essence that, by imposing the $8 Charge on its customers, the County Authority exceeded its statutory authority.  American Heritage contended that, because sewer service laterals are owned by the owners of the buildings to which they connect, the County Authority should charge customers according to their need of repair rather than by a per-unit flat fee.  American Heritage asked the trial court to declare that (1) the imposition of the $8 Charge constitutes an *ultra vires* act of the County Authority and is not "just and equitable, as required by statute and under the common law"; (2) the $8 Charge breaches the County Authority's contracts with American Heritage and the other members of the class; (3) the Program violates Tennessee Code Annotated section 7-35-401; and (4) the Program creates a monopoly that violates the Tennessee Constitution, Article II, section 21.[8]  American Heritage also asked the trial court to order the County Authority to cease collecting the $8 Charge, conduct an accounting, and refund all collected charges to the landowners who had paid them.  Overall, American Heritage sought declaratory relief, injunctive relief, restitution, costs, and any other available relief.

In response, the County Authority filed a motion to dismiss.  The County Authority contended first that American Heritage's lawsuit should be dismissed because American Heritage had failed to exhaust the administrative remedies set forth in Tennessee Code Annotated sections 86-221-607[9] and 69-3-124 and Rule 25 of the County Authority's bylaws.  The County Authority also asserted in the motion to dismiss that American Heritage's complaint did not allege sufficient facts to support a class

---

[8] It is likely that American Heritage intended to challenge the Program based on Article I, section 22 of the State Constitution, which prohibits "perpetuities and monopolies."

[9] This statute was likely intended to be Section 68-221-607, because Title 86 does not exist in the code.  This discrepancy is irrelevant, however, because the County Authority later abandoned its reliance on the statute.

action under Rules 23.01 and 23.02 of the Tennessee Rules of Civil Procedure and that American Heritage had failed to join the State of Tennessee as an indispensable party.

The initial trial judge, the Honorable L. Marie Williams, denied the motion to dismiss. The County Authority then filed its answer to the complaint, in which it denied all material allegations and asserted affirmative defenses. After that, American Heritage filed a motion asking the trial court to certify the class of plaintiffs. American Heritage defined the class as "[a]ll [County Authority] customers who are being or have been charged the [$8 Charge]," excluding certain persons affiliated with the County and persons whose property had already been inspected or repaired under the Program.

In February 2013, the County Authority filed a motion for summary judgment. Soon thereafter, the trial court entered an order indicating that it planned to entertain American Heritage's motion for class certification before considering the summary judgment motion filed by the County Authority.

Subsequently, Judge Williams entered an order recusing herself from the case. Eventually, it was assigned to the Honorable Jacqueline S. Bolton.

In April 2013, the County Authority filed a motion to amend its answer, which was granted.[10] In the amended answer, the County Authority asserted for the first time that it is a "utility district" within the meaning of the Utility District Law of 1937 (UDL), Tennessee Code Annotated section 7-82-101 *et seq.* Because it is a utility district, the County Authority claimed, the UDL administrative procedures applicable to a rate protest by a utility district customer would apply to this rate protest filed by American Heritage. See Tenn. Code Ann. § 7-82-402 (2015). In fact, the County Authority asserted that the UDL administrative process was "the exclusive method of adjudicating such disputes." Because American Heritage did not file an administrative petition under the UDL before it filed suit, the County Authority maintained, American Heritage had "failed to exhaust administrative remedies as provided by T.C.A. [§] 7-82-701 *et seq.*"

In May 2013, the County Authority filed its second motion to dismiss. In this motion, consistent with its amended answer, the County Authority asked the trial court to dismiss based on American Heritage's failure to exhaust its administrative remedies under the UDL[11] as well as its failure to join indispensable parties. In September 2013,

---

[10] The County Authority was later permitted to again amend its answer to include a defense based on the Tennessee Constitution and issue notice to the Attorney General of its constitutional challenge.

[11] The County Authority's second motion to dismiss did not explicitly cite the exhaustion doctrine. Rather, it asserted that American Heritage failed to file a petition with the Utility Management Review Board as would be required under Section 7-82-102(a), and also failed to file an administrative

following argument from counsel for the parties, the trial court concluded that the administrative remedies found in Section 7-82-401 *et seq.* "are not mandated," so it denied the second motion to dismiss.

At around the same time, American Heritage filed a motion for partial summary judgment. American Heritage contended that it was entitled to partial summary judgment because the undisputed facts show that the $8 Charge is inequitable, unlawful, and void.

In October 2013, the trial court entered an order. The trial court acknowledged that several dispositive motions were pending,[12] but it raised an issue that had not yet been addressed by the parties. The trial court noted that none of the parties' pending motions "address an issue which the Court believes must be initially resolved," namely, the applicability of Brown v. Tennessee Title Loans, Inc., 328 S.W.3d 850 (Tenn. 2010), which addressed whether there was a private right of action under the Tennessee Title Pledge Act to contest alleged excessive interest and fees. The trial court directed the parties to review Brown and file briefs analyzing how it applied to the case at bar. The trial court held the parties' dispositive motions in abeyance pending submission of their briefs on Brown.

**Lower Court Decisions**

In January 2014, after reviewing the supplemental briefs on Brown, the trial court entered an order denying American Heritage's motion for partial summary judgment and granting the motion for summary judgment filed by the County Authority. The trial court reasoned:

> The Court finds that the case at hand is directly comparable to *Brown*. Tennessee Code Annotated Section 68-221-101 is a regulatory scheme over the public utilities in Tennessee. Tennessee Code Annotated Section 7-82-402[, a provision of the Utility District Law of 1937], provides the process by which the utility rates may be contested. The plaintiff attempts to distinguish this case from *Brown* by arguing that instead of asserting a private right of action, it simply seeks to recover

complaint within 30 days of the 2008 or 2009 audit report establishing the $8 Charge as would be required under Section 7-82-402. It is undisputed, however, that the gist of the County Authority's argument is exhaustion of administrative remedies, and it has been framed as such as these proceedings have progressed.

[12] The motions pending at the time were the County Authority's motion for summary judgment, American Heritage's motion for partial summary judgment, and American Heritage's motion for class certification.

- 7 -

charges that have been imposed without any statutory authorization or justification. However, under the statutory scheme in T.C.A. § 7-82-402, the procedure for contesting the utility charges is presented with no express right for the plaintiff to recover charges by private action nor any implied intent that there be a right to private action. Pursuant to the reasoning of the Tennessee Supreme Court in *Brown*, the plaintiff must show that a right to private action be "manifestly clear" since the defendant utility is governed by a regulatory statute. 328 S.W.3d at 863. The Court holds that the plaintiffs have not met their burden in this case.

Thus, the trial court presumed that this dispute was governed by the UDL and that Section 7-82-402 set forth "the procedure for contesting the utility charges." It concluded, however, that the UDL did not present an "express right for [American Heritage] to recover charges by private action," so it granted summary judgment in favor of the County Authority on that basis. Based on this holding, the trial court found that American Heritage's motion for class certification was moot. In the alternative, the trial court ruled on the motion for class certification. It held that American Heritage had satisfied the requirements for class certification under Rules 23.01 and 23.02 of the Tennessee Rules of Civil Procedure and that "the plaintiff's motion for class certification should be granted" in the event that "the appellate court decides that the plaintiff has a private right of action." American Heritage appealed.

On appeal, the Court of Appeals disagreed with the trial court's conclusion that the UDL applies to this dispute. It held that the UDL does not apply because the County Authority is not a "utility district" for purposes of the administrative procedures set out in Part 4 of the UDL. American Heritage Apartments, Inc. v. Hamilton Cnty. WWTA, No. E2014-00302-COA-R3-CV, 2015 WL 399215, at *6-7 (Tenn. Ct. App. Jan. 30, 2015). The appellate court first compared the WWTA Act with the UDL, noting that there are different processes to establish either a wastewater treatment authority or a utility district. Id. In light of this, the appellate court concluded that the County Authority would not be considered a "utility district" because it had not "undergone the statutorily prescribed process of becoming a utility district pursuant to the UDL." Id. at *7. The appellate court acknowledged that Section 7-82-701(a) was amended in 2002 to expand the definition of "utility district" to include an entity such as the County Authority for some purposes. See Tenn. Code Ann. § 7-82-701(a) (2015). It pointed out, however, that the statutory expansion of the definition of the term "utility district" applied only to "this part," referring to Part 7 of the UDL and not to Part 4. American Heritage, 2015 WL 399215, at *7. It further observed that, around the same time, other amendments were made to the Wastewater Facilities Act of 1987 (Section 68-221-1001 to –1015 (2013)) and the Drinking Water Revolving Loan Fund Act of 1997 (Section 68-221-1201 to – 1206 (2013)), and none of those amendments indicated any intent to expand the

definition of "utility district" beyond "that specifically ascribed to Part 7 of the UDL." Id. at *7. The Court of Appeals stated that "while Part 7 includes a statutory structure for review of utility districts' financial statements and reports, . . . it includes no administrative recourse for users protesting rates." Id. For these reasons, it reversed the trial court's holding that the administrative procedure in Part 4 of the UDL applied to American Heritage's rate dispute with the County Authority. Id.

The Court of Appeals next considered whether American Heritage could bring a private action pursuant to the WWTA Act. It noted that the WWTA Act does not include a procedure for customers to challenge the rates set by a wastewater treatment authority, such as the administrative procedure set forth in the UDL. Id. at *10. It reviewed the powers of a wastewater treatment authority as enumerated in Section 68-221-607(a) and the WWTA Act as a whole, and it determined "that the legislature contemplated that a water and wastewater treatment authority would constitute a separate entity with its own authority to 'sue and be sued.'" Id. at *9 (quoting Section 68-221-607(a)(1)). Applying the Brown factors for ascertaining whether there is a private right of action under a statute, the appellate court then found that the legislature intended for there to be a private right of action under the WWTA Act:

> [C]onsidering the Brown factors in light of the record as a whole, we determine that (1) as a customer of the County WWTA, American Heritage is an intended beneficiary of the protection provided by the WWTA Act, particularly Tennessee Code Annotated § 68-221-608 regarding charges for services; (2) express legislative intent granting the County WWTA the authority to "sue or be sued" is stated in Tennessee Code Annotated § 68-221-607(a)(1), and there is no indication of legislative intent, express or implied, to deny a private right of action; and (3) implying a private right of action, consistent with the constraints of governmental immunity, is consistent with the underlying "public and governmental purpose" of the WWTA Act as stated in Tennessee Code Annotated § 68-221-602(a). See Brown, 328 S.W.3d at 855-56.

Id. In light of the lack of any administrative remedy in the WWTA Act and the legislature's apparent intent to provide for a private right of action under the WWTA Act, the appellate court held that American Heritage could maintain its action against the County Authority. Consequently, it reversed the trial court's grant of summary judgment to the County Authority. Id.

Given its holding in favor of American Heritage, the Court of Appeals went on to review the trial court's alternative holding that the requirements for class certification had

been met.[13]  The appellate court stated that the County Authority did not dispute that the Rule 23.01 requirements for class certification had been met:  numerosity, commonality, typicality, and adequacy of representation.  Id. at *13.  It also noted that "Rule 23.02 provides three alternative grounds for finding a class action maintainable with a finding of 'superiority' being the third."  Id.  The appellate court acknowledged that the trial court had not specified which of the three grounds on which it relied in certifying the class, but nevertheless surmised that the trial court had relied on the first ground because the language in its order seemed "focused on the first of these alternative grounds."  Id. On this basis, the appellate court found "no abuse of discretion in the trial court's alternative holding that, upon our reversal of summary judgment, American Heritage's motion for class certification should be granted."  Id.  Other issues that had been pretermitted by the trial court's grant of summary judgment to the County Authority were remanded for the trial court's consideration.  Id. at *14.

The County Authority filed an application for permission to appeal.  We granted permission in order to address whether the administrative procedures and remedies in the UDL apply to this dispute and, if so, whether they require American Heritage to exhaust its administrative remedies before filing suit.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

In this appeal, the County Authority argues that the Court of Appeals erred in reversing the trial court's grant of summary judgment in its favor.  It contends that American Heritage was required to exhaust the administrative procedures set forth in the UDL before filing this lawsuit.  Since American Heritage failed to do so, the County Authority contends, the lawsuit must be dismissed.  The County Authority also argues that both of the lower courts erred in holding that the requirements for class certification are met in this action.

This appeal arises out of the trial court's grant of summary judgment.  Because American Heritage filed its lawsuit in October 2011, the trial court considered the motion for summary judgment in accordance with the standard set forth in Tennessee Code Annotated section 20-16-101, applicable to actions initiated on or after July 1, 2011.  See Sykes v. Chattanooga Hous. Auth., 343 S.W.3d 18, 25 n.2 (Tenn. 2011).

---

[13] The County Authority argued that, because the class certification issue was not adjudicated by the trial court in its judgment, the Court of Appeals should not address the issue.  American Heritage, 2015 WL 399215, at *10.  In the interest of judicial economy, the Court of Appeals exercised its discretion to nevertheless review the trial court's ruling on class certification.  Id.

On October 26, 2015, however, this Court issued its decision in Rye v. Women's Care Center of Memphis, MPLLC, 477 S.W.3d 235 (Tenn. 2015). In the wake of Rye, we apply the summary judgment standard set forth in that case, to wit:

> [W]hen the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." Id. When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. [v. Zenith Radio Co.], 475 U.S. [574,] 586 [(1986)]. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.

Rye, 477 S.W.3d at 264 (emphasis in original). This Court reviews a trial court's grant of summary judgment *de novo*, with no presumption of correctness in the trial court's decision. Id. at 250.

The issues presented on appeal involve statutory interpretation. We review the interpretation of the statutes by the lower courts *de novo*, with no presumption of correctness. Hayes v. Gibson Cnty., 288 S.W.3d 334, 337 (Tenn. 2009).

- 11 -

## Exhaustion of Administrative Remedies

The County Authority argues that the Court of Appeals erred in reversing the trial court's dismissal of American Heritage's lawsuit for failure to exhaust administrative remedies. Its argument is based on the premise that the administrative procedures set forth in the UDL are mandatory and must be followed in all utility rate disputes, including American Heritage's challenge of the $8 Charge assessed by the County Authority. Because American Heritage failed to exhaust the UDL administrative remedies, the County Authority contends, its lawsuit must be dismissed.

Addressing this issue requires us to briefly immerse ourselves in the statutes governing utility districts and wastewater treatment authorities. We will then consider whether the statutes support the County Authority's position.

### *UDL*

Enacted in 1937, the UDL is found in Title 7 of the Tennessee Code Annotated, entitled "Consolidated Governments and Local Governmental Functions and Entities." The UDL takes up the entirety of Chapter 82 under the "Special Districts" chapters. In Chapter 82, the UDL grants counties the authority to create utility districts, including water and sewer utility districts.[14]

The UDL sets out detailed procedures for the formation of a public utility district. First, under Section 7-82-201(a), the owners of real property in the district must file a petition for incorporation with the Utility Management Review Board and with the mayor of the county in which the proposed district would be situated. Information required for the petition includes the proposed boundaries of the district and the reasons why the existing utility districts or other municipal or county services cannot meet the needs of the petitioners. If the Utility Management Review Board approves the petition, the petition is forwarded to the county mayor for a public hearing. If the mayor determines that "public convenience and necessity" require the creation of the utility district and that "creation of the district is economically sound and desirable," the mayor enters an order making these findings and approving the utility district. Id. § 7-82-202(a)(3). Once created, the utility district is incorporated and "shall be a 'municipality' or public

---

[14] Cities and towns are authorized to create sewer systems under Chapter 68 of the Public Acts of 1933, now codified at Title 7, Chapter 35, entitled "Sewers and Waterworks." See Tenn. Code Ann. § 7-35-401. That statutory scheme, however, is not at issue in this appeal.

corporation in perpetuity under its corporate name." Id. § 7-82-301(a)(1)(A) (2015). The powers of the utility district are vested in the board of commissioners of the district; these include the powers to "[f]ix, maintain, collect and revise rates and charges for any service." Id. § 7-82-304(a)(6) (2015).

The UDL also includes specific requirements for the operation of a utility district. A utility district must file an audited annual financial report in accordance with standards set by the Comptroller of the Treasury. Id. § 7-82-401(a)(1). It must also file an annual statement containing, among other things, "the water rates then being charged by the district." Id. § 7-82-401(d)(4). The UDL requires both to be "filed with the county mayor or mayors where publication is required in accordance with this section and § 7-82-608," that is, publication in a newspaper of general circulation in each of the counties situated in whole or in part in the district. Id. §§ 7-82-401(e), 7-82-608.

As the County Authority points out, the UDL outlines administrative procedures for challenging utility district rates. These procedures are contained in two parts, Part 1 and Part 4. Part 1 gives the Utility Management Review Board "the authority to review rates charged . . . by public utility districts." Id. § 7-82-102(a)(1)(A). This review "can only be initiated by a petition containing the genuine signatures of at least ten percent (10%) of the customers within the authorized area of the public utility district." Id. The administrative procedure for review under Part 1 of the UDL is not at issue in this appeal.

The UDL rate challenge procedure in Part 4 is the administrative procedure that is at issue in this case. Part 4 allows for a rate challenge to be filed by an individual customer of the utility district. Section 7-82-402 provides: "Within thirty (30) days of the date on which the statement provided for in § 7-82-401 is published, any customer of the district may file with the commissioners of the district a protest, giving reasons why . . . the rates so published are too high or too low." Id. § 7-82-402(a)(1)(A). Under subsection (a)(3), if a protestant is dissatisfied with the final position of the utility district commissioners, she may, "by simple written request," appeal to the Utility Management Review Board "with the right to judicial review as provided in § 7-82-702." Id. § 7-82-402(a)(3). By cross-reference in Section 7-82-702, the UDL grants the Utility Management Review Board the power to "[r]eview and conduct an informal hearing of any decision of any utility district under § 7-82-402(a) . . . upon simple written request of any utility district customer or any member of the public within thirty (30) days after [the commissioners'] decision." Id. § 7-82-702(a)(7). The statute provides: "Any judicial review of any decision of the board will be held by common law certiorari within the county in which the hearing was held." Id.

- 13 -

*WWTA Act*

Almost forty years later, in 1974, the General Assembly enacted the WWTA Act, codified in Part 6 of Title 68 of the Tennessee Code Annotated, on "Health, Safety and Environmental Protection," Chapter 221 on "Water and Sewerage."[15] Tenn. Code Ann. §§ 68-221-601—618 (2015); see Harpeth Valley Utils. v. Metropolitan Gov't of Nashville & Davidson Cnty., No. 01A01-9711-CH-00686, 1998 WL 313397, at *3 (Tenn. Ct. App. June 12, 1988).

The procedures in the WWTA Act are more abbreviated than those in the UDL. The WWTA Act provides that any city, metropolitan government, or county may create a wastewater treatment authority, and it sets forth its own procedures for doing so. The WWTA Act provides that the creating entity must publish notice of a hearing, conduct a public hearing, determine that "the public convenience and necessity require the creation of an authority," adopt a resolution or ordinance creating the wastewater treatment authority, and then file the resolution or ordinance with the secretary of state. See Tenn. Code Ann. § 68-221-604 (2013). "[U]pon such adoption and filing, the authority shall constitute a body politic and corporate, with all the powers hereinafter provided." Id. § 68-221-604(d)(2). At that point, the creating governmental entity transfers to the wastewater treatment authority "the treatment works properties, functions, service area and outstanding obligations" of the creating entity. Id. § 68-221-604(e)(1).

The WWTA Act provides that wastewater treatment authorities are "public and governmental bodies acting as agencies and instrumentalities of the creating and participating governmental entities" involved in their formation or operation. Id. § 68-221-602(a). The governing body of a wastewater treatment authority is a board of commissioners that is "appointed by the executive officer of the creating governmental entity and approved by its governing body."[16] Id. § 68-221-605(a)(1) (2013).

As can be seen, wastewater treatment authorities serve much the same function as utility districts, but there are some differences between the two. The WWTA Act states

---

[15] The WWTA Act is separate from the Regional Water and Wastewater Treatment Act ("Regional WWTA Act"), which was promulgated in 2007 as Part 13 of Title 68, Chapter 221. It authorizes "[a]ny contiguous city, metropolitan government, county or utility district" to create a water and wastewater treatment authority under the procedures set forth in that part. Tenn. Code Ann. § 68-221-1304(a) (2013). The Regional WWTA Act is not applicable in this appeal; indeed, it had not even been enacted at the time the County Authority involved in this case was created.

[16] The Board of Commissioners of the County Authority is comprised of representatives from Hamilton County and the seven incorporated cities that joined in its formation.

that wastewater treatment authorities may, among other things, "fix the price or charges for its water and waste treatment services rendered to users within and without the service area of the authority." Id. § 68-221-608(a). The authorities must be audited and must issue a public report on such audits. Id. § 68-221-607(14). However, unlike the UDL's provisions regarding utility districts, the WWTA Act does not require wastewater treatment authorities to publish either their rates or their audits.[17] Important to the issues in this appeal, in contrast to the UDL, the WWTA Act does not contain administrative procedures by which wastewater treatment authority customers could seek to challenge their rates.

## *UDL Definition of Utility District*

While the WWTA Act and the UDL are generally separate and distinct, the UDL contains some provisions that define the term "utility district" to include sewer systems formed under the WWTA Act. These UDL provisions are the basis for the County Authority's exhaustion of administrative remedies argument, so we examine them in detail.

The first provision in Part 7 of the UDL, Section 7-82-701, creates the Utility Management Review Board in the office of the Comptroller of the Treasury for the purpose of advising utility district governing bodies in the area of utility management. Tenn. Code Ann. § 7-82-701(a). It also vests the Utility Management Review Board with "authority over all utility districts." Id. As put by the Court of Appeals below, "Part 7 includes a statutory structure for [the Utility Management Review Board's] review of utility districts' financial statements and reports." American Heritage, 2015 WL 399215, at *7. Section 7-82-701(a) goes on to provide:

> *For purposes of this part,* "utility district" includes agencies, authorities or instrumentalities of government created by public or private act having the authority to administer a water or wastewater facility, other than those agencies, authorities or instrumentalities of government electing pursuant to § 68-221-1006(a) or § 68-221-1206(a) to come under the jurisdiction of the water and waste water financing board.

Id. (emphasis added). Thus, under this statute, the term "utility district" is defined to include a wastewater treatment authority "[f]or purposes of this part," namely, Part 7.

---

[17] The County Authority conceded at oral argument that it is not required by statute to publish its rates and that the $8 Charge at issue here was not published in a newspaper of general circulation.

With a similar limitation, another provision in the UDL defines the term "utility district" to include a wastewater treatment authority. Section 7-82-401(h)(1) requires all "utility districts" to include water losses in their audited financial reports, as prescribed by the Utility Management Review Board. Tenn. Code Ann. § 7-82-401(h)(1) (2015). The next subsection, subsection (h)(2), provides: "*For the purposes of subdivision (h)(1)*, 'utility district' includes agencies, authorities or instrumentalities of government created by public or private act having the authority to administer a water or wastewater facility," again with an exception for those that elect to come under the jurisdiction of the Water and Wastewater Financing Board. Id. § 7-82-401(h)(2) (emphasis added).

Thus, under these two provisions in the UDL, a wastewater treatment authority that has not elected to come under the jurisdiction of the Water and Wastewater Financing Board must submit audited financial reports to the Utility Management Review Board, and it must include its water losses in those audited reports.

### *Exhaustion of UDL Administrative Remedies*

The County Authority's exhaustion argument is premised on its contention that it is a "utility district" for purposes of Part 4 of the UDL.[18] It claims that, because Section 7-82-701(a) provides that a wastewater treatment authority falls under the purview of the Utility Management Review Board, a customer who seeks to challenge its rates should be required to first seek recourse with the Utility Management Review Board through the UDL administrative procedures in Part 4. The County Authority notes that utility districts and wastewater treatment authorities are governed by two different boards— either the Utility Management Review Board, created in the UDL, or the Water and Wastewater Financing Board ("WWF Board"), established in Title 68, Chapter 221, Sections 68-221-1008(a)(1) and 68-221-1006(a)(8). The County Authority points out that it did not elect to come under the jurisdiction of the WWF Board; consequently, under the UDL, it is governed by the Utility Management Review Board.[19] Id. § 7-82-701(a). The County Authority acknowledges that Section 7-82-701(a) states that "utility district" should be defined to include a wastewater treatment authority "[f]or purposes of [Part 7]." It dismisses the significance of the limiting language by arguing that, once the legislature expressly brought wastewater treatment authorities under the governance of the Utility Management Review Board, any rate challenge brought against the County Authority must be brought according to the procedure in Part 4 of the UDL.

---

[18] In making its argument on exhaustion of administrative remedies, the County Authority does not argue that American Heritage was required to follow the procedures in Part 1 of the UDL.

[19] The record contains an affidavit by the executive director of the County Authority indicating that the County Authority did not elect governance by the WWF Board.

In response, American Heritage notes the fact that Part 4 of the UDL, specifically Section 7-82-402, applies only to "utility districts." It emphasizes the limiting language in Section 7-82-701(a) expressly indicating that a wastewater treatment authority is a utility district *only* for purposes of Part 7. This means, American Heritage insists, that a wastewater treatment authority is *not* a utility district for other purposes, including the Section 7-82-402 administrative procedures. In support, American Heritage points to the context in which the legislature amended Section 7-82-701(a) to expand the definition of the term "utility district." The 2002 amendment to Section 7-82-701(a), American Heritage points out, was part of a broader package of amendments intended to facilitate financing opportunities for water and wastewater systems. Since Part 7 has to do with financing, American Heritage argues, this indicates that the legislature did not intend to make wastewater treatment authorities synonymous with "utility districts" for all purposes of the UDL. Thus, American Heritage contends, the Court of Appeals was correct in reversing the trial court's dismissal of its lawsuit.

The issue presented requires us to construe the relevant statutes. In construing statutes, our role is to determine legislative intent and to effectuate legislative purpose. Lee Med., Inc. v. Beecher, 312 S.W.3d 515, 526 (Tenn. 2010); In re Estate of Tanner, 295 S.W.3d 610, 613 (Tenn. 2009). The text of the statute is of primary importance, and we seek to give the words their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose. See Lee Med., 312 S.W.3d at 526; Hayes, 288 S.W.3d at 337; Waldschmidt v. Reassure Am. Life Ins. Co., 271 S.W.3d 173, 176 (Tenn. 2008).

To determine whether American Heritage was required to exhaust administrative remedies before filing suit, we will first examine the language of Section 7-82-701 and the 2002 UDL amendment expanding the definition of "utility district," on which the County Authority relies. We then seek to ascertain the purpose of the amendments and the legislature's intent by looking overall at the UDL *in pari materia* with the WWTA Act, and by considering the context and substance of the 2002 amendments to the UDL. As will be seen, all routes in this case lead inexorably to the conclusion reached by the Court of Appeals below.

As outlined above, the UDL was enacted to prescribe the requirements for creating and operating utility districts. The UDL does not, however, contain a general definition of the term "utility district," other than as an entity to be created under the statutes.

The 2002 amendment to Section 7-82-701 of the UDL was the first indication that the term "utility district" could include anything other than an entity created pursuant to the UDL. As previously stated, the 2002 amendment added language stating that the

term "utility district" includes water and wastewater treatment authorities "[f]or purposes of [Part 7]" of the UDL. Tenn. Code Ann. § 7-82-701(a). Similarly, in 2007, Section 7-82-401(h)(2) expanded the term "utility district" to include water and wastewater treatment authorities for a specified purpose—for purposes of subdivision 7-82-401(h)(1).[20]

We can presume that the legislature "acted purposefully" in adding language limiting the expanded definition to specified purposes. Bryant v. Genco Stamping & Mfg. Co., 33 S.W.3d 761, 765 (Tenn. 2000); accord American Heritage, 2015 WL 399215, at *7 ("[T]he specific inclusion of [wastewater treatment authorities] in the definition of utility districts in Part 7 excludes such authorities from the definition of utility districts in the other parts of the Act in which they are not specified."). Moreover, "a legislature is presumed to have used no superfluous words." In re Hogue, 286 S.W.3d 890, 896 (Tenn. 2009) (quoting Platt v. Union Pac. R.R., 99 U.S. 48, 58 (1878)); see Lee Med., 312 S.W.3d at 527 (noting that courts presume the legislature "used every word deliberately"). In looking at the language of Section 7-82-701, it is apparent that the legislature included wastewater treatment authorities in the definition of "utility district" in order to bring the authorities within the governing umbrella of the Utility Management Review Board for specified purposes that do *not* include the Part 4 administrative procedures.

The County Authority argues vigorously against this view. It contends that, by including wastewater treatment authorities in the definition of "utility district" in Section 7-82-701(a), the legislature intended to give the Utility Management Review Board the power to preside over rate disputes between a wastewater treatment authority and its customers. In support, the County Authority cites another provision in Part 7, Section 7-82-702(a)(7), which contains a cross-reference to Part 4 of the UDL. This provision in Part 7 gives the Utility Management Review Board the power to "[r]eview and conduct an informal hearing of any decision of any utility district under § 7-82-402(a) [in Part 4 of the UDL] . . . within thirty (30) days after such decision." Tenn. Code Ann. § 7-82-702(a)(7). This Part 7 cross-reference to Part 4, the County Authority argues, shows legislative intent to treat wastewater treatment authorities like utility districts not only for purposes of Part 7, but also for purposes of the administrative procedures in Part 4 of the UDL.

To evaluate this argument, we must examine the cross-references to Part 4 that are contained in Part 7 of the UDL. Part 4 includes Section 7-82-402(a)(3), which provides the administrative process by which a utility district customer may ask the Utility

[20] Subsection (h) was added to Section 7-82-401 by the General Assembly in 2007. See 2007 Tenn. Pub. Acts ch. 243 (approved May 24, 2007) (codified at Tenn. Code Ann. § 7-82-401(h)).

Management Review Board to review the actions of the board of commissioners of a utility district, including setting water rates.[21] As noted by the County Authority, Part 7 of the UDL, specifically Section 7-82-702(a)(7), gives the Utility Management Review Board the power and authority to review the board of commissioners' decisions.[22] Thus, Section 7-82-402(a)(3) prescribes the appeal process, and Section 7-82-701(a)(7) authorizes the Utility Management Review Board to perform the administrative function referenced in Section 7-82-402(a)(3). Compare Tenn. Code Ann. § 7-82-402(a)(3) with Tenn. Code Ann. § 7-82-702(a)(7). This appears to be normal statutory cross-referencing; on its face, it does not indicate a legislative intent to import into Part 4 the expanded definition of "utility district" contained in Section 7-82-701(a).

Furthermore, a close look at Section 7-82-402 undercuts the County Authority's assertion that the legislature intended Part 4 of the UDL to apply to wastewater treatment authority rate disputes. The procedure for filing a rate dispute set forth in Section 7-82-402 begins with the following instructions: "Within thirty (30) days of the date on which the *statement provided for in § 7-82-401 [containing the water rates] is published*, any customer of the district may file with the commissioners of the district a protest . . . ." Tenn. Code Ann. § 7-82-402(a)(1)(A). While the UDL requires utility districts to publish a statement containing the rates being charged, the WWTA Act does not require wastewater treatment authorities to either file a statement or publish their rates. Therefore, measuring the filing deadline for a rate dispute from "the date on which the statement provided for in § 7-82-401 is published" is inconsistent with the County Authority's position that the rate dispute procedure was intended to apply to wastewater treatment authorities because the statement to which the statute refers is not required of a wastewater treatment authority.

The County Authority nevertheless insists that the legislature must have intended the 2002 Section 7-82-701(a) expanded definition of "utility district" to bring wastewater treatment authorities within the purview of the UDL Part 4 administrative process. It points out that, under the statutory interpretation utilized by the Court of Appeals below, customers of wastewater treatment authorities would have no administrative procedure for challenging their water rates.

---

[21] Section 7-82-402(a)(3) states: "Any protestant feeling aggrieved by the final action of the commissioners under this section may obtain a review of the commissioners' action by simple written request to the utility management review board within thirty (30) days thereafter, with the right to judicial review as provided in § 7-82-702." Tenn. Code Ann. § 7-82-402(a)(3).

[22] Section 7-82-702(a)(7) states that the Utility Management Review Board has the authority to "[r]eview and conduct an informal hearing of any decision of any utility district under § 7-82-402(a)." Tenn. Code Ann. § 7-82-702(a)(7).

An overall view of the UDL, considered *in pari materia* with the WWTA Act, gives some support to the position urged by the County Authority. A comparison between utility districts under the UDL and wastewater treatment authorities under the WWTA Act reveals numerous parallels between the two. As outlined above, both types of entities may serve a similar overall purpose of providing water and wastewater treatment services to citizens, both are formed according to their respective statutes with the participation of local governmental officials, both are governed by a board of commissioners, both must be audited, and both set rates for water-related services. Only the UDL, however, contains an administrative procedure for individual citizens to dispute water rates. In light of the statutory parallels between utility districts and wastewater treatment authorities, and given the legislature's expansion of the term "utility district" to include wastewater treatment authorities for at least some purposes, there is some appeal to the argument that these purposes were intended to include the UDL administrative procedures. Such an interpretation of the UDL amendments would give customers of utility districts and wastewater treatment authorities alike an administrative avenue to dispute water rates.

Alas, we find no support in the 2002 UDL amendments for the County Authority's assertion that the legislature intended for the amendments to make wastewater treatment authorities subject to the UDL Part 4 administrative process. As we have pointed out, the 2002 amendment that expanded the definition of "utility district" in Section 7-82-701— the only arguable basis for applying Part 4 to wastewater treatment authorities—was only one provision in a comprehensive package of statutory amendments. As explained below, a review of the whole 2002 amendment package demonstrates that it was designed primarily to provide loan and financing options for water and wastewater treatment entities.

In addition to amending Section 7-82-701, the 2002 amendments resulted in additional provisions in the Wastewater Facilities Act of 1987 and the Drinking Water Revolving Loan Fund Act of 1997, two separate Acts that have complementary functions. The Wastewater Facilities Act addresses compliance with state and federal wastewater water quality and drinking water standards, and the Drinking Water Revolving Loan Fund Act established revolving loan programs to aid local governments and water systems in establishing self-sufficiency, support system improvements, protect water quality, and improve public health. See Tenn. Code Ann. §§ 68-221-1002(a), 68-221-1202(a) (2013). The aim of both Acts is to create a revolving loan program to "be used in coordination with state and federal assistance programs." Id. §§ 68-221-1002(b), 68-221-1202(b).

The 2002 amendments included a number of provisions that worked together to allow water authorities, such as wastewater treatment authorities, to have access to the

revolving loan program. For example, the 2002 amendments expanded the definition of "local government" contained in the Wastewater Facilities Act to include not only local governmental entities and utility districts, but also "any instrumentality of government created by any one or more of the foregoing or by an act of the General Assembly," thus encompassing wastewater treatment authorities. See 2002 Tenn. Pub. Acts ch. 603 (approved April 11, 2002) (codified at Tenn. Code Ann. § 68-221-1003(7)(A)(i)). Similarly, the 2002 amendments broadened the definition of "water system" in the Drinking Water Loan Act to include not only community public water systems of counties, municipalities and utility districts, but also any "instrumentality of government created by any one or more of the foregoing or by an act of the General Assembly as well as such governmental entity," which would include wastewater treatment authorities. Id. (codified at Tenn. Code Ann. § 68-221-1203(6)). At the same time, both Acts were amended to permit local governments and water systems that had obtained the low-cost government loans to assign their rights and obligations under the loans to any other local government or system.[23] Id. §§ 68-221-1005, 68-221-1205 (2013).

The legislative history of the 2002 amendments to the UDL confirms that they were intended to enhance financing options for regional entities such as wastewater treatment authorities. The amendments were presented in House Bill 3140 and Senate Bill 3093; the bill summary for HB 3140 explains the need for the legislation:

> Under present law, the department of environment and conservation administers a program for loans to local governments for wastewater facilities under the wastewater facility revolving loan fund and a program for loans to water systems under the drinking water revolving loan fund. This bill would authorize any local government to assign its rights and obligations under a wastewater facility revolving loan or a water system to assign its rights and obligations under a drinking water revolving loan to any other local government or system. . . . Under present law, local governments and water systems receiving these low[-]cost loans must agree to maintain financial records in accordance with governmental accounting

_____

[23] The 2002 amendments required the local governments and water systems to conduct annual audits and file the audits with the Comptroller. Id. §§ 68-221-1006(a)(6); 68-221-1206(a)(6) (2013). They also made local governments and water systems having taxing power subject to the jurisdiction of the WWF Board, while all other local governments and water systems (including the County Authority, which does not have taxing power) remained subject to the jurisdiction of the Utility Management Review Board. Id. §§ 68-221-1006(a)(8), 68-221-1206(8) (2013). As noted above, the local governments and water systems (other than utility districts formed under the UDL) governed by the Utility Management Review Board were permitted to elect to come under the jurisdiction of the WWF Board. Id. As we have indicated, the County Authority did not elect to come under the jurisdiction of the WWF Board.

standards and conduct an annual audit of the facility's financial records. This bill would require the above audit and would additionally require the local government or system to: (1) [c]onduct its annual audit in accordance with governmental auditing standards and with minimum standards of the comptroller of the treasury; (2) [f]ile the audit with the comptroller; and (3) [a]gree to be subject to the jurisdiction of the [W]ater and [W]astewater [F]inancing [B]oard established for local governments or water systems having taxing power. All other local governments or systems would be subject to the [U]tility [M]anagement [R]eview [B]oard.

Tenn. Bill Summary, 2002 Reg. Sess. H.B. 3140.[24] The bill summary goes on to explain that, while the Utility Management Review Board was already authorized to advise utility districts on utility management, the proposed legislation would authorize it to advise regional authorities as well:

Present law defines "system" and "water system" to mean community public water systems of counties, municipalities, and utility districts formed pursuant to [the UDL]. This bill would expand this definition to include the community public water systems of an incorporated town or city, metropolitan government, state agency, or an entity of the government created by the above groups or by the general assembly. This bill would require all regional authorities to file an annual financial audit with the comptroller of the treasury and to be subject to the comptroller's audit. *Under present law, a utility management review board advises utility district boards of commissioners on utility management. For purposes of such review board, this bill would define "utility districts" to include agencies, authorities or instrumentalities of government created by public or private act having the authority to administer a water or wastewater facility.*

Id. (emphasis added).

Comments by Senator Douglas Henry made in the course of his presentation of the legislation indicate that it originated from the office of Tennessee's Comptroller and that he proposed the legislation in order to facilitate financing opportunities for a new "creature . . . called a regional authority." *Joint Session Hearing on Senate Bill 3093* (March 27, 2002). He noted that regional authorities such as wastewater treatment

---

[24] Although a bill summary, compiled by a legislative service, does not recite the intent of any legislator regarding a particular bill, we find it instructive because it is provided to legislators to explain the perceived need for the proposed legislation.

authorities were created to provide water and wastewater treatment services to cities, counties, and utility districts, and explained that the proposed legislation would enable those regional authorities to borrow money from the State loan fund:

> The way it works is the regional authority . . . borrows money from the State loan fund, and they, with that money, go out and buy up any existing bonds that the utility districts have out or escrow it to meet [inaudible] maturity of those bonds.

*Joint Session Hearing on Senate Bill 3093* (March 20, 2002). A week later, in a joint session, Senator Henry gave a similar overview of the bill:

> [T]his bill comes from the Comptroller's office. Today there is a creature around called "regional authority." What is concerned is water or wastewater service. What the regional authority can do and has done in a few instances is purchase city systems, or county systems, utility district systems, even private systems. [They] combine them all into one system for water or wastewater purposes. This bill allows . . . the regional authority to . . . obtain loans from the State so they can buy out these public districts and so that they can escrow the money to cover the bonds when due that the districts simply buy.

*Joint Session Hearing on Senate Bill 3093* (March 27, 2002).

Importantly, none of the 2002 amendments were related to administrative procedures or customer disputes regarding water rates. None of the discussion in the legislative history touches on either administrative procedures or water rate disputes. All pertain to the financing options for regional entities that provide water and wastewater treatment services.

From all of this, we must conclude that the argument made by the County Authority is simply a bridge too far. Our task is to interpret the statutes as they are written. Perhaps it could be argued that the legislature *should* require customers of wastewater treatment authorities who wish to dispute their water rates to utilize the UDL Part 4 administrative process; regardless, it has not done so. We agree with the Court of Appeals below that the 2002 amendment to Section 7-82-701(a) was not intended to mean that wastewater treatment authorities are deemed "utility districts" for all purposes under UDL; rather, they are considered "utility districts" only for the purposes specified in the statute. Therefore, we affirm the Court of Appeals' conclusion that the UDL administrative procedure in Part 4 is inapplicable to this rate dispute, and we affirm its

decision to reverse the trial court's dismissal of American Heritage's lawsuit for failure to exhaust administrative remedies.

## Remaining Issues

The County Authority also argues that the Court of Appeals erred in affirming the trial court's alternative ruling on class certification. It claims that the class action was not actually certified by the trial court and that the parties did not fully brief the question of whether the class would have been certified had the case not been dismissed. The County Authority also argues that the trial court must make additional findings of fact before it can certify the class under Rule 23. The County Authority asserts that, because the trial judge who rendered the alternative ruling on class certification is no longer available, the new trial judge will need direction as to what issues need to be decided on remand.

The Court of Appeals commented that "the trial court was clearly attempting to conserve needless litigation in the event that this Court reversed summary judgment." American Heritage, 2015 WL 399215, at *10. For the same reason, the appellate court exercised its discretion to review the trial court's decision on class certification. Id. It concluded that the trial court did not abuse its discretion in certifying the class and so affirmed its decision. Id. at *13.

From our review of the record, we must respectfully disagree with the Court of Appeals' implicit conclusion that the trial court decided the class action issue with sufficient specificity to allow for meaningful appellate review. Under Rule 23, the proponent of class certification has the burden of proving the requirements of both Rule 23.01 and Rule 23.02. Rule 23.01 provides that the class certification proponent must establish numerosity, commonality, typicality, and adequacy of representation. Tenn. R. Civ. P. 23.01; see Walker v. Sunrise Pontiac-GMC Truck, Inc., 249 S.W.3d 301, 307-08 (Tenn. 2008). Once those are established, the proponent must establish one of the three requirements listed in Rule 23.02.[25] Id. at 308.

---

[25] Rule 23.02 provides:

An action may be maintainable as a class action if the prerequisites of 23.01 are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(a) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

- 24 -

The trial court's order in this case indicated that both Rule 23.01 and 23.02 were satisfied. However, the trial court did not indicate the subsection of Rule 23.02 upon which it relied in making that determination. Despite this omission and the lack of express findings of fact in the order, the Court of Appeals gathered from some of the language used in the order that the trial court had relied on the first subsection. The Court of Appeals then conducted its analysis based on that assumption.

Certainly there are many cases in which this approach is appropriate, serving judicial efficiency and avoiding unnecessary litigation for the parties. However, we must respectfully disagree with it for a pivotal threshold issue such as certification of a class. In order for an appellate court to conduct a meaningful review of a trial court's discretionary decision on class certification, the trial court must identify sufficient facts upon which it based its decision.[26] In addition, although the record indicates that the trial court conducted a hearing on the question of class certification, the appellate record did not include the transcript of any such hearing.[27] Therefore, with no factual findings and

---

(b) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or would substantially impair or impede their ability to protect their interest; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the question of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of a class action.

Tenn. R. Civ. P. 23.02.

[26] For example, the crux of American Heritage's argument is that there is disparity in how customers are treated and that charging an $8 fee penalizes some low-volume water users and benefits high-volume users. If this is so, and the class is defined to include all of the County Authority's customers, then the members of the class would have interests that are not aligned.

[27] The record on appeal appears to indicate that the trial court conducted a hearing on class certification. The record contains a scheduling order which schedules the class certification hearing for September 23, 2013. In a comment made in the transcript of the October 14, 2013 hearing on summary

no record of the evidence submitted at any hearing, it is difficult to determine whether or to what extent the trial court actually engaged in the appropriate analysis in its alternative ruling. Remand to the trial court is not possible because the trial judge who certified the class is no longer on the bench. The new trial judge would be required to try the case based on the former trial judge's nonspecific rulings.

Given this posture, we deem it prudent to vacate the trial court's alternative ruling on class certification and remand for the trial court to reconsider the issue anew. See, e.g., Government Emps. Ins. Co. v. Bloodworth, No. M2003-02986-COA-R10-CV, 2007 WL 1966022, at *51 (Tenn. Ct. App. June 29, 2007) ("Based on the record before us, we cannot conclude that the class proponent has met her burden of establishing that the requirements of Tenn. R. Civ. P. 23.02(3) have been met. Neither can we conclude that the trial court has conducted the type of analysis necessary to insure compliance with those requirements. Consequently, we must vacate the trial court's order certifying this action as a class action."). On remand, the trial court will have the opportunity to conduct a hearing, order discovery, or conduct any other necessary proceedings. If the trial court finds that certification is warranted, we trust that it will expressly state the basis for its decision.[28]

Within its argument on class certification, the County Authority argues that the Court of Appeals erred in holding that the WWTA Act created a private right of action. In our view, however, this is not properly raised within the context of the issue on class certification; rather, it is a separate argument on the merits. On this issue, we agree with the analysis and conclusion of the Court of Appeals' holding and adopt its reasoning. See American Heritage, 2015 WL 399215, at *8-10.

## CONCLUSION

We hold that the County Authority is not a "utility district" for purposes of Part 4 of the UDL; therefore, American Heritage was not required to exhaust the administrative procedures found in Part 4 of the UDL before filing this lawsuit to challenge the County Authority's $8 Charge. We vacate the trial court's alternative ruling on class certification and remand for reconsideration in light of our holding herein. We also affirm the Court of Appeals' holding that the WWTA Act creates a private right of action. For these

judgment, counsel for the County Authority indicated that the class certification hearing was held "three weeks ago." From this, we surmise that the class certification hearing was probably conducted. Nevertheless, a transcript of that hearing is not included in the appellate record.

[28] The County Authority also made arguments regarding the merits of the trial court's class certification decision. Our decision to vacate the trial court's ruling on class certification is not a decision on the merits of any of the County Authority's arguments.

reasons, the decision of the Court of Appeals is affirmed in part and reversed in part, the decision of the trial court is vacated in part, and the case is remanded to the trial court for further proceedings consistent with this opinion. Costs on appeal are to be taxed to the Appellant Hamilton County Water and Wastewater Treatment Authority, Hamilton County, Tennessee, for which execution may issue, if necessary.

_____
HOLLY KIRBY, JUSTICE