RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0294p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

MICHIGAN CORRECTIONS ORGANIZATION, Service
Employees International Union, Local 526M, et al.,

     *Plaintiffs-Appellants,*

  *v.*

MICHIGAN DEPARTMENT OF CORRECTIONS; DANIEL
H. HEYNS, acting in his official capacity as Director
of the Michigan Department of Corrections,

     *Defendants-Appellees.*

No. 14-1028

─────────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 5:13-cv-13262—John Corbett O'Meara, District Judge.

Argued: December 4, 2014

Decided and Filed: December 17, 2014

Before: SILER, SUTTON, and McKEAGUE, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** John R. Runyan, Jr., SACHS WALDMAN, Detroit, Michigan, for Appellants. Jeanmarie Miller, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees. **ON BRIEF:** John R. Runyan, Jr., Marshall J. Widick, SACHS WALDMAN, Detroit, Michigan, for Appellants. Jeanmarie Miller, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees.

---

**OPINION**

---

SUTTON, Circuit Judge.  Constitutional challenges to the enforcement of wage-and-hour laws are not new.  By themselves, these cases could tell much of the story of the metes and bounds of federal and state power.  As today's dispute shows, that history continues to unfold.

Several corrections officers sued the Michigan Department of Corrections and its Director, claiming a right to overtime pay under the Fair Labor Standards Act and state law. Two threshold defenses, the district court held, stood in the way of the federal claim:  Sovereign immunity barred the corrections officers from seeking damages from an agency of the State (the Department of Corrections), and the FLSA precluded the corrections officers from seeking injunctive or declaratory relief against the Director.  In the absence of a cognizable federal claim, the district court declined to exercise jurisdiction over the state law claims.  We affirm.

I.

Michigan corrections officers must perform several pre-shift and post-shift activities, including "punching a mechanical time clock," "waiting in line" for security, and "walking to assigned locations."  Appellants' Br. at 2.  These activities take place off the clock.  Thinking this uncompensated requirement unfair, several corrections officers (and their union) filed this lawsuit under the Fair Labor Standards Act and state law to recover overtime payments for these activities.  29 U.S.C. §§ 206, 207; Mich. Comp. Laws §§ 408.414, .414a.

The lawsuit did not get far.  As an arm of the State, the Michigan Department of Corrections moved to dismiss the case for lack of jurisdiction on sovereign immunity grounds. The corrections officers responded by adding a claim for declaratory relief against the Department's director, Daniel Heyns.  That did not help.  The district court dismissed the officers' FLSA claims anyway and declined to exercise supplemental jurisdiction over the state law claims.  *See* 28 U.S.C. § 1367(c)(3).

II.

Does Michigan's constitutional immunity from suit prevent the officers from bringing this claim for overtime wages under the FLSA? The district court answered yes, and so do we.

Debates over governmental power to regulate the wages and working conditions of employees have taken many turns. At the beginning of the last century, the Supreme Court held that the freedom-of-contract guarantees of the United States Constitution prohibited the States from regulating the terms of employment relationships. *See Lochner v. New York*, 198 U.S. 45, 64 (1905); *Coppage v. Kansas*, 236 U.S. 1, 26 (1915). The Supreme Court began to dismantle the *Lochner* era in 1917, when it upheld a state law capping working hours at ten hours per day, *Bunting v. Oregon*, 243 U.S. 426, 438, and formally brought the period to an end in 1937, when it upheld a state minimum-wage law, *W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 400.

The end of one era launched another, this time over the lines between federal and state power in the area. Congress enacted the Fair Labor Standards Act in 1938, and it applied the legislation only to private-sector workers. Pub. L. No. 75-718, § 3(d), 52 Stat. 1060, 1060. The Supreme Court held that Congress's powers under the Commerce Clause permitted it to regulate the wages of private-sector workers, even workers whose employment activities and handiworks did not cross state lines. *United States v. Darby*, 312 U.S. 100, 122–26 (1941).

In 1966, Congress began the process of extending the FLSA's protections to city and state workers. Pub. L. No. 89-601, § 102(b), 80 Stat. 830, 831. That extension of the law led to nineteen years of litigation over a different federalism question: Did Congress violate the reserved powers of the States under the Tenth Amendment by regulating core state functions, namely the hours and wages of governmental workers? The Court first answered yes, *Nat'l League of Cities v. Usery*, 426 U.S. 833, 852 (1976), but reversed course and answered no nine years later, *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 531 (1985).

Another eleven years after that, the debate took another Hegelian turn. At issue was not the FLSA but a federal law regulating Indian gaming. *Seminole Tribe v. Florida*, 517 U.S. 44 (1996), held that Congress could not use its Article I Commerce Clause power to abrogate a State's constitutional immunity from money-damages lawsuits. *Id.* at 66. Only through its

Section 5 enforcement power under the Fourteenth Amendment, *Seminole Tribe* reasoned, could Congress overcome that immunity from suit. *Id.* at 65. It fell to still another FLSA case to clarify that the States' immunity from suit arises from the Eleventh Amendment and background sovereignty principles embedded in the Constitution and thus applies to money-damages actions filed in federal *and* state court. *Alden v. Maine*, 527 U.S. 706, 712–13 (1999).

What we are left with is this: Congress may abrogate the States' sovereign immunity through its Section 5 power to enforce the Fourteenth Amendment, not through its Article I enforcement power. *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 78–80 (2000). Section 5 authorizes two types of legislation: laws that target actual violations of the Fourteenth Amendment, *United States v. Georgia*, 546 U.S. 151, 159 (2006), and laws that go beyond the protections of the Fourteenth Amendment so long as there is "a congruence and proportionality" between the statutory rights and Fourteenth Amendment violations by the State. *City of Boerne v. Flores*, 521 U.S. 507, 520 (1997). Any time Congress tries to abrogate the States' immunity from suit, the Court has added, the legislature must "unequivocally express[] its intent" to do so. *Kimel*, 528 U.S. at 78.

Seventy-six years after Congress enacted the FLSA, the Court thus has clarified these lines of federal and state power:

- The Commerce Clause empowers Congress, not just the States, to enact national wage-and-hour laws.

- The Tenth Amendment does not prevent Congress from extending those laws to state and local workers.

- The Commerce Clause does not allow Congress to abrogate the States' constitutional immunity from lawsuits by individuals.

- Section 5 of the Fourteenth Amendment permits Congress to abrogate the States' immunity from suit and in the process to subject them to money-damages actions to remedy actual violations of the Fourteenth Amendment or to impose extra-constitutional requirements on the States that are "congruent and proportional" to prior Fourteenth Amendment violations.

- Section 5 legislation not only must invoke an appropriate power, but it also must unmistakably impose liability on the States.

Enter the Michigan corrections workers.   In 2013, they sued the Department of Corrections, an entity of the State under Michigan law, Mich. Comp. Laws § 791.201, to obtain overtime wages under the FLSA.  The Tenth Amendment as shown does not bar the lawsuit, and the language of the FLSA satisfies the unequivocal-expression requirement.  The law says that a suit to enforce the FLSA "may be maintained against any . . . public agency," which includes "the government of a State" and "any agency of . . . a State."  29 U.S.C. §§ 203(x), 216(b).  Whether Congress invoked a permissible source of power to abrogate Michigan's constitutional immunity from suit is another matter.

The corrections workers concede that the Commerce Clause will not do the job in light of *Alden* and *Seminole Tribe*.  And our court closed off another potential route several years ago, holding that the FLSA is not a proportionate and congruent use of the enforcement power under the Equal Protection Clause.  *Wilson-Jones v. Caviness*, 99 F.3d 203, 209–11 (6th Cir. 1996).

The plaintiffs try another tack.  They argue that these federal statutory rights—minimum wages and overtime pay—amount to fundamental rights of national citizenship protected by the Privileges or Immunities Clause of the Fourteenth Amendment.  As they see it, a State's violations of the FLSA always amount to violations of the Fourteenth Amendment and thus always justify the FLSA's abrogation of sovereign immunity.

This argument faces two swift headwinds.  In the first place, the theory makes the Court's three-quarters-of-a-century effort to strike a balance between delegated federal power and reserved state power look like a precedential waste of time.  If FLSA violations invariably infringe Fourteenth Amendment rights, the Tenth Amendment debate between *National League of Cities* and *Garcia* was for naught.  The same is true about the *Alden* debate.  Why worry about power under the Commerce Clause if FLSA violations always amount to privileges-or-immunities violations?

In the second place, the Privileges or Immunities Clause has made more headway in the legal academy than it has in the courts as an independent source of Fourteenth Amendment rights.  Ever since the *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1872), the Clause has remained "[l]argely dormant" and has been overtaken by substantive due process as a source of new rights.  *Johnson v. Bredesen*, 624 F.3d 742, 751–52 (6th Cir. 2010).   In its current

incarnation, the Clause protects only "fundamental" rights of national citizenship. *Slaughter-House*, 83 U.S. at 76. "[P]rivileges and immunities which are fundamental . . . have at *all times* been enjoyed by citizens of the several States which compose this Union." *Id.* (emphasis added); *see McDonald v. City of Chicago*, 561 U.S. 742, 754 (2010).

The FLSA does not meet that test. Federal wage-and-hour protections first became law in 1938 through congressional legislation. Neither the vintage of the law nor its subject bespeaks a fundamental right in the constitutional sense. No court to our knowledge has deemed wage-and-hour protections fundamental under the Constitution, and we see no reason to be the first. A State does not violate the Privileges or Immunities Clause by denying the minimum-wage or overtime-pay requirement established by Congress in the FLSA.

In the absence of a past (or imminent future) violation of the Fourteenth Amendment, Congress has no remedial power under Section 5 to authorize private lawsuits against the States. And in the absence of permissible Section 5 legislation abrogating the State's immunity from suit, we lack jurisdiction to entertain these FLSA claims against the Department of Corrections. The district court correctly dismissed these claims for lack of jurisdiction.

III.

May the federal courts, in the context of a private enforcement action, grant a declaratory judgment under *Ex parte Young* against the Department's director, Daniel Heyns, to address an alleged ongoing violation of the FLSA? The district court answered no, and so do we.

The corrections workers invoke the Declaratory Judgment Act and *Ex parte Young* as a way to overcome, or at least sidestep, Michigan's immunity from suit. The Act authorizes federal courts to declare the rights of a party in a case without granting any other relief. 28 U.S.C. § 2201. The point of the statute is to create a remedy for a preexisting right enforceable in federal court. It does not provide "an independent basis for federal subject matter jurisdiction." *Toledo v. Jackson*, 485 F.3d 836, 839 (6th Cir. 2007); *see Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72 (1950). Such an independent source of rights exists when, at the time of the lawsuit, one of the parties already could bring a "coercive" action that Congress authorized the federal courts to hear. *See Medtronic, Inc. v. Mirowski Family Ventures, LLC*,

134 S. Ct. 843, 848 (2014) (quotation omitted); *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 19 n.19, 20 (1983). A party may bring a "coercive action" only when a private right of action authorizes the party to seek "an immediately enforceable remedy like money damages or an injunction." *Skelly Oil*, 339 U.S. at 671.

Three potential causes of action come to mind here: a right of action in the FLSA itself; a right of action under § 1983; or a right of action under *Ex parte Young*. Not one of these potential sources of rights, however, supplies the requisite jurisdiction for this action.

*The FLSA.* The FLSA does not provide a basis for this declaratory judgment action. The statute, to be sure, provides a private right of action for compensatory damages to remedy wage-and-hour violations. *See* 29 U.S.C. § 216(b). But that action exceeds the plaintiffs' reach. They sued Director Heyns in his official capacity, and an official-capacity lawsuit for money damages counts as a lawsuit against the State. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). As just noted, we lack jurisdiction over money-damages lawsuits against a State to enforce the FLSA. When a court lacks jurisdiction over the underlying right of action, it lacks jurisdiction over a related declaratory judgment action as well. *Skelly Oil*, 339 U.S. at 671–72.

What about injunctive relief? That does not work either. The FLSA nowhere creates a private right of action to enjoin wage-and-hour violations and, to the contrary, grants all such authority to the Department of Labor. "The Administrator [of the Department of Labor's Wage and Hour Division]," the FLSA says, "shall bring *all actions . . .* to restrain violations of" its minimum-wage and overtime provisions. 29 U.S.C. § 211(a) (emphasis added). By explicitly delegating this task to the Department, Congress implicitly precluded private-party injunction actions. *See, e.g., Luder v. Endicott*, 253 F.3d 1020, 1021 (7th Cir. 2001); *United Food & Commercial Workers Union, Local 1564 v. Albertson's Inc.*, 207 F.3d 1193, 1197–98 (10th Cir. 2000); *Powell v. Florida*, 132 F.3d 677, 678–79 (11th Cir. 1998) (collecting other cases); *see also Lorillard v. Pons*, 434 U.S. 575, 581 (1978). Absent a cognizable private-party money-damages action or injunction action in the FLSA, the correction workers may not obtain a freestanding remedy under the Declaratory Judgment Act.

What of the possibility of implying a cause of action for declaratory relief in the FLSA? *See Allen v. State Bd. of Elections*, 393 U.S. 544, 554–57 (1969). A separate problem looms

here. Implied causes of action had their heyday in *J.I. Case Co. v. Borak*, 377 U.S. 426, 433–34 (1964), but today the Court presumes that, when a statute contains an enforcement mechanism but does not expressly provide a private remedy, Congress did not mean to permit private enforcement of the statute. *See, e.g.*, *Alexander v. Sandoval*, 532 U.S. 275, 287 (2001); *see also Barnes v. Gorman*, 536 U.S. 181, 185–88 (2002); *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 173–77 (1994).

The takeaway from these and other cases is that legal remedies to enforce federal statutes must stem from the legislatively enacted statute, not from court-created equitable enforcement doctrines. The choice to provide "private rights of action to enforce federal law," just like the choice to enact "substantive federal law itself," rests in Congress's hands. *Sandoval*, 532 U.S. at 286. If a statute fails to provide a private remedy, the federal courts may not create what Congress did not. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 164–65 (2008).

Just so here. The FLSA permits only the Department of Labor to seek injunctions under the statute. "The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval*, 532 U.S. at 290. Declaratory judgments "in every practical sense operate" like injunctive relief, *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 299 (1943); *see Green v. Mansour*, 474 U.S. 64, 72–73 (1985), meaning that the implication of a private declaratory judgment action would not only be in tension with the statutory scheme but also would essentially contradict it. Confirming the similarity of the two actions, the Court has long held that the Tax Injunction Act precludes declaratory relief even though the language of the Act forbids only injunctions. *California v. Grace Brethren Church*, 457 U.S. 393, 408–11 (1982). Having provided authority only for the Department of Labor to bring injunction actions, Congress did not permit courts to imply a private right to bring injunction actions or their direct relation: a declaratory judgment right of action.

*Section 1983.* Section 1983 does not supply the requisite cause of action either. *Maine v. Thiboutot*, 448 U.S. 1, (1980), it is true, permits private parties to enforce federal statutes through § 1983 in some settings. *Id.* at 4–6. But that is not true here, as recent decisions of the Supreme Court confirm. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121 (2005); *Gonzaga*

*Univ. v. Doe*, 536 U.S. 273, 290 (2002); *Blessing v. Freestone*, 520 U.S. 329, 346–48 (1997); *Suter v. Artist M.*, 503 U.S. 347, 363 (1992).

*Rancho Palos Verdes* observed that no case in which the Supreme Court permitted plaintiffs to use § 1983 to enforce statutory rights involved a statute with an express private remedy. *See* 544 U.S. at 121. "The provision of an express, private means of redress in the statute itself," the Court said, "is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983." *Id.* The FLSA as noted not only contains its own remedial scheme but also precludes a remedy that § 1983 would permit: private-party injunctions. Those two facts suggest § 1983 cannot supplement the private money-damages cause of action already present in the FLSA. *Accord Kendall v. City of Chesapeake*, 174 F.3d 437, 443 (4th Cir. 1999).

*Ex parte Young.* Nor does *Ex parte Young*, 209 U.S. 123 (1908), provide the necessary coercive action to permit declaratory relief. That case and others since allow federal courts to enjoin state officers in their official capacity from prospectively violating a federal statute or the Constitution. *See Va. Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632, 1638 (2011). Official-capacity lawsuits normally amount to lawsuits against the State, *see Toledo*, 485 F.3d at 838, but *Ex parte Young* carves out an exception to that rule in order to safeguard the supremacy of federal law, *see Green*, 474 U.S. at 68. The exception rests on the theory that, at least for purposes of prospective relief, a state official who violates federal law is "stripped of his official or representative character." *Stewart*, 131 S. Ct. at 1638 (quotation omitted). Adding force to this position, the corrections workers add, is the reality that a judgment about prospective rights (e.g., a declaratory judgment), like a judgment prospectively compelling someone to do something (e.g., an injunction), is available in a proper *Ex parte Young* action. *Verizon Md. Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 646 (2002).

But *Ex parte Young* does not apply here, and *Seminole Tribe* provides an initial explanation why. When an Indian Tribe tried to invoke *Ex parte Young* to compel the Governor of Florida to permit certain gaming activities on tribal land under the Indian Gaming Regulatory Act, the Court prohibited it. 517 U.S. at 73. The Gaming Act, the Supreme Court explained, circumscribed the remedies available to Tribes aggrieved by state non-compliance with the

federal law.  *Id.* at 50, 74.  A court could order a non-compliant State to conclude a compact within 60 days; if that did not work, the court could appoint a mediator; and if that did not work, the Secretary of the Interior could promulgate gaming regulations binding on the State.  *Id.* at 50. What the Tribe wanted was a different remedy—an order forcing the State's hand immediately— but one that the text of the Gaming Act did not offer.  Given the Act's "carefully crafted and intricate remedial scheme," the Court inferred that Congress did not mean to expose state officials to "the full remedial powers of a federal court" and thus "refused to supplement that scheme" with *Ex parte Young* actions.  *Id.* at 73–74, 75.

That is not normally how plaintiffs lose *Ex parte Young* claims.  When courts dismiss such actions, it usually is because the relief sought, though styled as prospective injunctive relief against a state official, in reality runs against the State or in reality is retroactive and monetary in nature.  *See, e.g.*, *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 281–82 (1997).  *Seminole Tribe* is different.  Not unlike the private-right-of-action and § 1983 cases, *Seminole Tribe* refused to evade the statute's private remedy with a remedy not mentioned in the statute.  Anyone seeking to enforce the Gaming Act in other words had to use the right of action in the statute.  But that right of action did not provide for injunctive relief, leaving the Tribe empty-handed.  *Seminole Tribe* confirms that, even in a case involving relief sought under *Ex parte Young*, courts must determine whether Congress intended private parties to enforce the statute by private injunction or for that matter by a declaratory judgment.  *Ex parte Young* by itself does not create such a cause of action.  Put another way, *Ex parte Young* provides a path around sovereign immunity *if* the plaintiff already has a cause of action from somewhere else.  *See Ind. Prot. & Advocacy Servs. v. Ind. Family & Soc. Servs. Admin.*, 603 F.3d 365, 392–93 (7th Cir. 2010) (en banc) (Easterbrook, J., dissenting on other grounds).

Two recent implied-cause-of-action cases confirm this understanding of *Seminole Tribe* and the broader principles that undergird it.  In *Sandoval* and *Brunner v. Ohio Republican Party*, 555 U.S. 5 (2008), the plaintiffs asked the Court to enjoin a state official from violating a federal statute.  In both cases, the Court rejected the plaintiffs' lawsuit because no private cause of action supported it.  *See Sandoval*, 532 U.S. at 287; *Brunner*, 555 U.S. at 6.  Why wasn't relief under *Ex parte Young* available?  The plaintiffs had sued a state officer in his official capacity after all,

and they sought only prospective injunctive relief. If those were the only two requirements needed to trigger *Ex parte Young*, the Court's dismissals in *Sandoval* and *Brunner* make no sense. *Seminole Tribe*, however, makes sense of them both. As in *Seminole Tribe*, *Sandoval* and *Brunner* each looked to the underlying statute to determine how Congress intended it to be enforced. Finding no express private right of action, *Sandoval* and *Brunner* concluded that Congress did not intend to permit private enforcement of the statute, whether through an implied right of action, § 1983, or *Ex parte Young*.

This explains why the Court allows litigants to use *Ex parte Young* to sue a state official to enforce a federal statute when the statute contains a private cause of action. *See Stewart*, 131 S. Ct. at 1636–37; *Verizon Md.*, 535 U.S. at 641. Yet when the allegedly violated statute contains no such private cause of action, *only once* to our knowledge has the Court permitted relief under *Ex parte Young*. *See Quern v. Jordan*, 440 U.S. 332 (1979). And *Quern* supports our reading of the *Ex Parte Young* cases. The plaintiffs in *Quern did* have a cause of action, one permissibly created by a different statute: § 1983. *See Edelman v. Jordan*, 415 U.S. 651, 675 (1974). They might not have needed one anyway. The relief in *Quern* was the sending of a notice to members of the plaintiff class, which is arguably procedural, not remedial, and thus arguably authorized by the Rules Enabling Act. *See* 440 U.S. at 334 n.3; *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408–11 (2010); Fed. R. Civ. P. 23.

None of this diminishes the role of *Ex parte Young*. It just establishes that the doctrine does not supply a right of action by itself. The doctrine applies when the requisite right of action exists and it remains a potent defense, particularly in preemption cases. Private parties who act in compliance with federal law may use *Ex parte Young* as a *shield* against the enforcement of contrary (and thus preempted) state laws. *See Verizon Md.*, 535 U.S. at 645; *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983). That makes sense, because an existing cause of action for that relief exists: an equitable anti-suit injunction. As classically understood, anti-suit injunctions permit potential defendants in legal actions to raise in equity a defense available at law. John Harrison, *Ex parte* Young, 60 Stan. L. Rev. 989, 997–99 (2008). That's what happened in *Ex parte Young*: Several railroad companies asserted in equity the Fourteenth Amendment's Due Process Clause as a defense against future indictment for violating

Minnesota's mandatory railroad rates.  *See* 209 U.S. at 130; *Stewart*, 131 S. Ct. at 1642 (Kennedy, J., concurring).  But matters differ when litigants wield *Ex parte Young* as a cause-of-action-creating *sword*.  In that setting—today's setting—the State is not threatening to sue anyone, precluding an anti-suit injunction from doing the work.  What is required is that Congress created a cause of action for injunctive relief in the statute or otherwise made § 1983 available.  This follows from the longstanding notion that courts of equity cannot "create a remedy in violation of law, or even without the authority of law." *Rees v. City of Watertown*, 86 U.S. (19 Wall.) 107, 122 (1874).

Nor does *Ex parte Young*'s grounding in the supremacy of federal law distinguish it from the § 1983 or implied-right-of-action cases.  The Supremacy Clause is "not a source of any federal rights." *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 613 (1979); *see Dennis v. Higgins*, 498 U.S. 439, 450 (1991).  It is a conflict-of-laws provision that "declares a truth[] which flows immediately and necessarily from the institution of a federal government."  The Federalist, No. 33.  "[S]aying that there is a private right of action under the Supremacy Clause would substantively change the federal rule established by Congress" in the statute and would make the § 1983 and implied-cause-of-action cases "serve no purpose." *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 132 S. Ct. 1204, 1212–13 (2012) (Roberts, C.J., dissenting).

All in all, neither the FLSA nor § 1983 nor *Ex parte Young* provides the private right of action the officers need to obtain declaratory relief against Director Heyns.  This stops their declaratory judgment action in its tracks.  No private right of action means no underlying lawsuit.  No underlying lawsuit means no jurisdiction. *Skelly Oil*, 339 U.S. at 671–72.  And no jurisdiction means no declaratory relief.

The officers offer two responses, neither of which is persuasive.  They insist that the relevant holding in *Seminole Tribe* was narrow:  *Only* "detailed," "carefully crafted," and "intricate remedial scheme[s]" show that Congress meant to remove *Ex parte Young* from the arsenal of a future claimant.  517 U.S. at 73–74.  That is not the FLSA, the plaintiffs add, because "suits by private plaintiff[s]" against employers for wage-and-hour violations "are themselves one of the main components of the remedial provisions of the FLSA."  Appellants' Br. at 15 (emphasis removed).  But this interpretation of *Seminole Tribe* makes too much of the

procedures at issue in the case and too little of what comes after the decision. The detailed procedures in *Seminole Tribe* were not important in and of themselves. Rather, as the First Circuit has put the point, "The Court read the remedial limitations imposed by the [Gaming Act] merely as a clue from which to deduce congressional intent." *Rosie D. ex rel. John D. v. Swift*, 310 F.3d 230, 235 (1st Cir. 2002); *see Stewart*, 131 S. Ct. at 1639 n.3; *Verizon Md.*, 535 U.S. at 647. *Seminole Tribe*'s focus in 1996 on the meaning of that statute foreshadowed the Court's later § 1983 and implied-right-of-action cases that also focus on congressional intent in discerning the enforcement options created by a statute. By leaving the permissible enforcement mechanisms that Congress has provided in a statute where they are rather than by supplementing them with other enforcement actions, the Court has respected the give-and-take of the legislative process and has left the invariable compromises in such laws where the Court finds them. *See, e.g., Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 93–94 (2002); *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 29 (1989); *see also* John F. Manning, *Foreward: The Means of Constitutional Power*, 128 Harv. L. Rev. 1, 22–30 (2014). Just as *Seminole Tribe* held that Congress precluded the federal courts from creating extra-statutory remedies in the Indian Gaming Act, we hold the same with respect to the FLSA.

The plaintiffs separately assert that cases from our circuit and others support their position. In *Wilson-Jones v. Caviness*, it is true, we suggested that a state employee could use *Ex parte Young* to enjoin a state officer from violating the FLSA. 99 F.3d at 211. But that one sentence of dictum says only that the *Eleventh Amendment* does not bar injunctive suits against state officers to enforce the FLSA. It does not address whether the *statute itself* forecloses such actions. When addressing the statutory question, other circuits have agreed with our approach. *See Mills v. Maine*, 118 F.3d 37, 55 n.7 (1st Cir. 1997); *Aaron v. Kansas*, 115 F.3d 813, 818 n.4 (10th Cir. 1997). None to our knowledge has disagreed. The plaintiffs also point to *Diaz v. Michigan Department of Corrections*, 703 F.3d 956 (6th Cir. 2013), where we applied *Ex parte Young* to a state employee's lawsuit seeking reinstatement under the Family Medical Leave Act. *Id.* at 965–66. Yet that statute expressly provides for such private-party relief, *see* 29 U.S.C. § 2617(a)(1)(B), while this statute provides no permissible private right of action available here. The final case invoked by the plaintiffs is *Balgowan v. New Jersey*, 115 F.3d 214 (3d Cir. 1997). The Third Circuit permitted a state employee to seek a declaration of FLSA rights not unlike the

one the plaintiffs seek here.   But the court's two-paragraph discussion did not consider the *Sandoval* requirement that Congress create a private right of action, the *Seminole Tribe* application of the rule, or the complex jurisdictional issues surrounding declaratory judgments.

## IV.

In addition to bringing claims under the FLSA, the plaintiffs brought claims under Michigan law.  *See* Mich. Comp. Laws §§ 408.414, .414a.   The district court "decline[d] to exercise supplemental jurisdiction" over those claims because it had dismissed all of the plaintiffs' federal claims.  R. 38 at 4; *see* 28 U.S.C. § 1367(c)(3).  We review that decision for an abuse of discretion.  *Bright v. Gallia Cnty.*, 753 F.3d 639, 659 (6th Cir. 2014).  Nothing of the sort happened here when the district court dismissed the state law claims without prejudice and permitted them to be refiled in state court.  *See* Fed. R. Civ. P. 41(b); *Bright*, 753 F.3d at 659.

## V.

For these reasons, we affirm.