FILED

06/15/2017

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 17, 2017 Session

## TENNESSEE FIREARMS ASSOCIATION, ET AL. v. METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE

Direct Appeal from the Chancery Court for Davidson County
No. 16-332-II    Carol L. McCoy, Chancellor

_____

No. M2016-01782-COA-R3-CV
_____

This appeal involves an attempt to challenge the legality of a gun show ban that was adopted for the Tennessee State Fairgrounds.  The trial court dismissed the complaint on numerous alternative grounds.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

John Isaac Harris, Nashville, Tennessee, and Scott L. Braun and Timothy R. Rudd, Dayton, Ohio, for the appellants, Tennessee Firearms Association, and International Gun-A-Rama, Inc.

Catherine Jane Pham, and Lora Barkenbus Fox, Nashville, Tennessee, for the appellee, Metropolitan Government of Nashville and Davidson County, Tennessee.

OPINION

### I. FACTS & PROCEDURAL HISTORY

The Metropolitan Government of Nashville and Davidson County ("Metro") owns and operates the Tennessee State Fairgrounds by and through a Metropolitan Board of Fair Commissioners ("the Board").  Metro generates revenue by renting the Fairground facilities to vendors.

For over thirty years, International Gun-A-Rama, Inc., d/b/a Bill Goodman's Gun

and Knife Show ("Goodman") rented facilities at the Fairgrounds to hold gun and knife shows. In November 2015, the Board presented Goodman with a draft proposal that would require additional restrictions at his gun shows beyond those imposed by state and federal law, such as prohibitions on sales between private parties at the gun shows. Apparently, Goodman and his attorney indicated that they would oppose any such restrictions. At a public meeting of the Board on December 1, 2015, the Board voted to terminate all existing contracts with gun show promoters and to prohibit any additional gun shows at the Fairgrounds until the Board decided otherwise. At its next meeting, in February 2016, the Board was advised by its legal counsel that Goodman had already executed contracts to rent the Fairground facilities through the end of 2016, and no basis existed for terminating those contracts. As such, the Board decided to honor the existing contracts and let them expire by their terms. However, the Board adhered to its original decision to prohibit the booking of any additional gun shows going forward, beginning with the 2017 calendar year.

In March 2016, Goodman submitted a request to reserve the Fairground facilities for numerous dates in 2017. The director of events for the Fairgrounds notified Goodman that he could not book any 2017 dates for gun shows "by the current directive of the Fair Board."

On April 5, 2016, Goodman and the Tennessee Firearms Association ("TFA") jointly filed a complaint for declaratory judgment in the chancery court of Davidson County. According to the complaint, TFA is a nonprofit corporation formed to promote the right to keep and bear arms, with members consisting primarily of residents of the State of Tennessee. As "Count I," the complaint alleged that the Board's recent decision to ban gun shows at the Fairgrounds constituted "a *de facto* local limitation on the legal transfer of firearms" in violation of Tennessee Code Annotated section 39-17-1314(a), which provides:

> Except as otherwise provided by state law or as specifically provided in subsection (b), the general assembly preempts the whole field of the regulation of firearms, ammunition, or components of firearms or ammunition, or combinations thereof including, but not limited to, the use, purchase, transfer, taxation, manufacture, ownership, possession, carrying, sale, acquisition, gift, devise, licensing, registration, storage, and transportation thereof, to the exclusion of all county, city, town, municipality, or metropolitan government law, ordinances, resolutions, enactments or regulation. No county, city, town, municipality, or metropolitan government nor any local agency, department, or official shall occupy any part of the field regulation of firearms, ammunition or components of firearms or ammunition, or combinations thereof.

As "Count II," the complaint alleged that the Board was not authorized to ban gun shows at the Fairgrounds pursuant to section 11.602(d) of the Metro Charter, which provides:

> All activities being conducted on the premises of the Tennessee State Fairgrounds as of December 31, 2010, including, but not limited to, the Tennessee State Fair, Expo Center Events, Flea Markets, and Auto Racing, shall be continued on the same site. No demolition of the premises shall be allowed to occur without approval by ordinance receiving 27 votes by the Metropolitan Council or amendment to the Metropolitan Charter.

The plaintiffs sought a declaration that the Board was precluded from adopting a blanket ban on gun shows at the Fairgrounds by both the Metro Charter provision and the aforementioned statute. They sought an order requiring Metro to make its facilities available to Goodman and to other gun show promoters without the imposition of any additional restrictions. They also sought an award of "nominal damages" against Metro based on its imposition of unauthorized restrictions on the transfer of firearms. On May 19, 2016, the trial court granted the plaintiffs' motion for a restraining order preventing Metro from taking any action to make the 2017 dates requested by Goodman unavailable for booking.

Metro filed a motion to dismiss the complaint on numerous grounds, including lack of standing and failure to state a claim. Metro submitted numerous provisions of the Metro Charter for the court's consideration. In opposition to the plaintiffs' request for injunctive relief, Metro also submitted to the court the minutes and transcripts of the Board's meetings, an affidavit from the director of the Fairgrounds, Goodman's previous rental contract, a list of events held at the Fairgrounds in 2010, and other documents.

After a hearing, the trial court entered a written order on July 20, 2016, denying the plaintiffs' request for injunctive relief, dissolving the restraining order, and granting Metro's motion to dismiss. The order states that the trial court considered the parties' motions and briefs, the affidavit of the director of the Fairgrounds, the previous contract, the records of the Board meetings, the list of events at the Fairgrounds in 2010, and other documents. Ultimately, the trial court found that dismissal of the complaint was warranted on numerous grounds. The trial court found that TFA lacked standing because it had no interest in Goodman's rental contracts with the Board. In addition, the trial court found that the Board "was acting pursuant to state law authority" when it decided whether to approve a gun show in its capacity as administrator of the Fairground premises, pursuant to Tennessee Code Annotated section 39-17-1311. The trial court also found that the plaintiffs' interpretation of the Metro Charter provision was inconsistent with the intent and language of the provision itself. The trial court found that

3

"[t]he voters desired that the types of activities that are mentioned in the Charter Amendment would continue, but they did not seek to restrict the Fair Board's ability to set the terms and conditions upon which those activities would be conducted." Alternatively, the trial court found that the plaintiffs had no "private right of action" to enforce the Metro Charter provision that was allegedly violated. For all of these reasons, the trial court dismissed the plaintiffs' complaint.

The plaintiffs timely filed a notice of appeal on August 19, 2016. That same day, the plaintiffs also filed a "Motion to Amend Final Order." The motion to amend asserted that the trial court "erred in its application of the law" and should have denied the motion to dismiss. After analyzing each of the trial court's rulings, the motion asked the court to "reconsider and amend" its order. After a hearing, the trial court denied the motion to amend on the basis that it "simply [sought] to relitigate issues" that were already adjudicated. The plaintiffs then filed an amended notice of appeal.

## II. ISSUES PRESENTED

The plaintiffs present the following issues for review on appeal:

1.     Whether the trial court erred in granting Metro's Rule 12.02(6) motion to dismiss; and

2.     Whether the trial court erred in denying the plaintiffs' Rule 59.04 motion to amend the final order.

For the following reasons, we affirm the decision of the chancery court and remand for further proceedings.

## III. STANDARD OF REVIEW

At the outset, we find it necessary to examine the procedural posture of this case. Metro filed a motion to dismiss for failure to state a claim, along with various provisions of the Metro Charter. In opposition to the plaintiffs' request for injunctive relief, Metro submitted numerous additional documents for the court to review, including the minutes and transcripts of Board meetings, an affidavit, a list of events held at the Fairgrounds, a previous contract, and other documents. The trial court heard the request for injunctive relief and the motion to dismiss at the same hearing. In its written order, the trial court stated that it granted Metro's motion to dismiss based on "the entire record in this matter." Therefore, we will review the trial court's decision as a grant of summary judgment to Metro. *See Vandergriff v. ParkRidge E. Hosp.*, 482 S.W.3d 545, 555 n.8 (Tenn. Ct. App. 2015) (quoting Tenn. R. Civ. P. 12.02) ("Converting a motion to dismiss

under Rule 12.02(6) into a motion for summary judgment is appropriate when 'matters outside the pleading are presented to and not excluded by the [trial] court.'"). We review a trial court's entry of summary judgment as a question of law with no presumption of correctness attached to the trial court's decision. *Sherrill v. Souder*, 325 S.W.3d 584, 596 (Tenn. 2010). A trial court's interpretation of statutes also involves questions of law that appellate courts review de novo without a presumption of correctness. *Shore v. Maple Lane Farms, LLC*, 411 S.W.3d 405, 414 (Tenn. 2013).

## IV. DISCUSSION

### A. Standing of TFA

We begin with the issue of TFA's standing. According to the Tennessee Supreme Court,

> The doctrine of standing is used to determine whether a particular plaintiff is entitled to judicial relief. *Knierim* [*v. Leatherwood*], 542 S.W.2d [806, 808 (Tenn. 1976)]. It is the principle that courts use to determine whether a party has a sufficiently personal stake in a matter at issue to warrant a judicial resolution of the dispute. *SunTrust Bank, Nashville v. Johnson*, 46 S.W.3d 216, 222 (Tenn. Ct. App. 2000). Persons whose rights or interests have not been affected have no standing and are, therefore, not entitled to judicial relief. *Lynch v. City of Jellico*, 205 S.W.3d 384, 395 (Tenn. 2006).

*Metro. Gov't of Nashville v. Bd. of Zoning Appeals of Nashville*, 477 S.W.3d 750, 755 (Tenn. 2015) (quoting *State v. Harrison*, 270 S.W.3d 21, 27-28 (Tenn. 2008)). "The party invoking the court's jurisdiction has the burden of establishing the elements of standing." *Hayes v. City of Memphis*, No. W2014-01962-COA-R3-CV, 2015 WL 5000729, at *9 (Tenn. Ct. App. Aug. 21, 2015) (*no perm. app. filed*).

The trial court found that TFA lacked standing because it had "no interest in Mr. Goodman's contracts with the Fair Board." The trial judge noted, "They can be an active cheering party all they want, but they are not qualified to stand as a party litigant in this lawsuit." On appeal, the plaintiffs maintain that TFA has standing to challenge the Board's gun show ban. In their brief, they quote two sentences from *Hayes*. One states that an organizational plaintiff may establish standing to sue for an injury to itself in its own right, and the other lists elements that organizational plaintiffs may alternatively show to establish standing to sue as a representative of its members with standing.[1]

---

[1]Those elements are: "(1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit." *Hayes*, 2015

5

However, the plaintiffs fail to analyze or explain how either type of standing was established by TFA under the facts of this case. They simply state, "Here, [TFA] has standing both in its own right and on behalf of its members arising out of the Fair Board's illegal termination of gun shows at the Nashville Fairgrounds that are attended by members of [TFA]."

"It is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived." *Sneed v. Bd. of Prof'l Responsibility of Supreme Court*, 301 S.W.3d 603, 615 (Tenn. 2010). "[P]arties must thoroughly brief the issues they expect the appellate courts to consider." *Waters v. Farr*, 291 S.W.3d 873, 919 (Tenn. 2009). Because the plaintiffs failed to develop more than a skeletal argument regarding TFA's standing, we decline to consider the issue on appeal.

## B. Preemption

We now turn to the substantive allegations of Goodman's complaint. As "Count I," Goodman alleged that Tennessee Code Annotated section 39-17-1314(a) precluded the Board from enacting a policy creating a blanket ban on gun shows at the Fairgrounds. Again, the statute provides:

> *Except as otherwise provided by state law* or as specifically provided in subsection (b), the general assembly preempts the whole field of the regulation of firearms, ammunition, or components of firearms or ammunition, or combinations thereof including, but not limited to, the use, purchase, transfer, taxation, manufacture, ownership, possession, carrying, sale, acquisition, gift, devise, licensing, registration, storage, and transportation thereof, to the exclusion of all county, city, town, municipality, or metropolitan government law, ordinances, resolutions, enactments or regulation. No county, city, town, municipality, or metropolitan government nor any local agency, department, or official shall occupy any part of the field regulation of firearms, ammunition or components of firearms or ammunition, or combinations thereof.

Tenn. Code Ann. § 39-17-1314(a) (emphasis added). Goodman argued that the Board's refusal to rent its facilities to gun show promoters constituted "a *de facto* local limitation on the legal transfer of firearms" that was prohibited and preempted by the statute.

---

WL 5000729, at *9 (citation omitted).

6

The trial court disagreed. It found that the Board "was acting pursuant to state law authority" when it decided whether to approve gun shows on the premises of the Fairgrounds in its capacity as administrator of the Fairgrounds. The trial court found that such authority was provided by another statute within the same Chapter and Part, Tennessee Code Annotated section 39-17-1311, which provides, in pertinent part:

(a) It is an offense for any person to possess or carry, whether openly or concealed, with the intent to go armed, any weapon prohibited by § 39-17-1302(a), not used solely for instructional, display or sanctioned ceremonial purposes, in or on the grounds of any public park, playground, civic center or other building facility, area or property owned, used or operated by any municipal, county or state government, or instrumentality thereof, for recreational purposes.

(b)(1) Subsection (a) shall not apply to the following persons:

. . . .

(J) . . . .

. . . .

(iii) A person possessing guns or knives when conducting or attending "gun and knife shows" *when the program has been approved by the administrator of the recreational building or property*[.]

(Emphasis added.) The trial court found that "[t]he Nashville Fairgrounds, by its nomenclature and the history of events that have been held there, constitutes a recreational facility owned by a governmental entity." As such, the court concluded that the statute permits a person to possess a firearm at the Fairgrounds "if that person is conducting or attending a gun show that has been approved by the Fair Board." By extension, the court concluded that section 39-17-1311 authorized the Board to decide whether or not to approve a gun show on the premises of the Nashville Fairgrounds.

On appeal, Goodman claims that the trial court erred in concluding that a privately rented facility such as the Fairgrounds is used for "recreational purposes." *See* Tenn. Code Ann. § 39-17-1311(a). Goodman claims that the Fairgrounds is closed to the public when not being utilized for activities and that it is merely "a facility made available to rent to others who use it as they contract to use it." Goodman also asserts that the trial court should have permitted discovery into the property's uses. However, the record before us does not demonstrate that Goodman sought to conduct discovery in the trial

court below.[2]  In response to Metro's motion to dismiss, Goodman only suggested that "it is questionable whether the Nashville Fairgrounds may be deemed to be operated for 'recreational purposes' . . . when it is rented to a private party for a private show," but Goodman suggested that the court did not need to reach that issue based on Goodman's reading of the Metro Charter.  Meanwhile, Metro submitted to the trial court a list of events held at the Fairgrounds in 2010, and the trial court apparently relied on that list in order to conclude that "[t]he Nashville Fairgrounds, by its nomenclature and the history of events that have been held there, constitutes a recreational facility owned by a governmental entity."  Goodman submitted no evidence to the contrary.

The Tennessee Supreme Court has recognized that within the Tennessee Code, "the meaning of the word 'recreational' varies depending on the context in which it is used."[3]  *Shore*, 411 S.W.3d at 428.  By its terms, the particular statute in this case applies to guns carried on "the grounds of any public park, playground, civic center or other building facility, area or property *owned, used or operated* by any municipal, county or state government, or instrumentality thereof, *for recreational purposes*," and it permits guns to be carried at gun shows on the property "when the program has been approved by the administrator of the *recreational* building or property[.]"  Tenn. Code Ann. § 39-17-1311(a), (b)(1)(J)(iii) (emphasis added).  *Merriam-Webster's Collegiate Dictionary* defines "recreational" as "of, relating to, or characteristic of recreation."  *Merriam-Webster's Collegiate Dictionary* 1040 (11th ed. 2014).  It defines "recreation," as relevant here, as "refreshment of strength and spirits after work; *also*: a means of refreshment or diversion."  *Id.*

---

[2]Goodman does not cite to any location in the record to indicate that he sought to conduct discovery, and nothing in the record before us indicates that such a request was made.  At oral argument before this Court, counsel for Goodman stated that he requested discovery during the hearing on the motion to dismiss and that the trial court declined to permit such discovery.  However, we have no transcript of the hearing to confirm that such a request was made and denied.  We cannot simply assume that the recited facts are true.  Statements by counsel during oral argument cannot be considered in lieu of a record of the proceeding.  *State v. Draper*, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990).  "[A]n appellate court is precluded from considering an issue when the record does not contain a transcript or statement of what transpired in the trial court with respect to that issue."  *Id.*  Here, the record before us does not establish any basis to grant Goodman relief on an issue regarding discovery.

[3]To demonstrate this point, the supreme court in *Shore* cited Tennessee Code Annotated section 11-7-103(a) (2012) (identifying certain recreational purposes as a basis for making tracts of land eligible for conservation and protection under the Tennessee Heritage Conservation Trust Fund); Tennessee Code Annotated section 11-10-101(6) (2012) (defining "recreational purposes" with regard to the liability of landowners who lease their property to the State for recreational purposes); Tennessee Code Annotated section 11-25-104(1) (2012) (identifying certain "recreational opportunities" as "adventure tourism activities" for the purpose of the Doe Mountain Recreation Authority Act of 2012); Tennessee Code Annotated section 70-7-102(a) (2012) (limiting the liability of landowners to persons engaging in "recreational activities" on the property without the landowner's permission).

We agree with the trial court's conclusion that the Fairground facilities are recreational property within the meaning of the statute. The Metro Charter authorizes the Board to hold "fairs and expositions" at the Fairgrounds and to lease the property for amusement purposes. The list of events held at the Fairgrounds includes the Tennessee State Fair, flea markets, bicycle clubs, neighborhood meetings, charity events, antique shows, wrestling, lawn and garden shows, barbecue events, birthday parties, races, boxing events, car shows, boat shows, toy train shows, dog shows, bird shows, and other similar events. We reject Goodman's suggestion that the Fairground facilities are not recreational facilities simply due to the fact that they are sometimes rented and/or closed to the public. The Office of the Attorney General construed this statute and considered the meaning of a public park or recreational facility within the meaning of the statute in an opinion dated July 29, 2015. We find its reasoning persuasive:

> The statute does not make any exceptions for facilities that are owned by a county or municipality but are operated under contract by a nonprofit corporation or other non-governmental entity. It makes no exception for facilities that charge admission or user fees or for facilities that have fences or other barriers to control ingress and egress. Applicability of the statute is not limited to normal or customary hours of operation of the facilities, and there is no exception for facilities that may be temporarily used for special events with limited attendance.

> . . . .

> By its plain terms, as amended, Tenn. Code Ann. § 39-17-1311 applies to all parks and all other recreational facilities that are owned or operated by a county or municipality. . . . Whether a fee is charged for use or admission or whether use or admission is free of charge is irrelevant. Likewise, it is irrelevant whether access is controlled by physical barriers or not.

> Moreover, an admission or use charge or a fence would not cause a public park or other public facility to lose its status as a public park or public facility. The term "public" commonly connotes property that has been set aside or is used to serve the state, county, or municipality as a whole as opposed [to] property used for private gain. *See, Webster's Ninth New Collegiate Dictionary*, at 952 (1988). The nature or character of the facility thus depends upon its purpose or the reason for its existence. The fact that admission or use fees may be charged does not alter the public character of a public facility. For example, the legislature has from time to time authorized the construction of toll roads and bridges. Those roads and

9

bridges were intended to serve the public at large. That purpose is not changed by the imposition of the costs of construction and maintenance on those who use them. *See, e.g., Montgomery County Clarksville & Russellville Turnpike Co.*, 109 S.W. 1152 (Tenn. 1908). State parks provide another example. Fees are charged to use campgrounds, golf courses, and other recreational facilities and to stay in lodges or cabins that are located within state parks. Such facilities do not lose their public character because the fee or other charge is imposed to defray the cost of providing the services offered and maintaining the properties.

Nor does the presence of gates, fences, or other barriers destroy the public character of a park or other public facility. Many municipal and county parks and other recreational facilities are not always open on a 24/7 basis. They often have set days and hours of operation and commonly use locked doors or gates and walls and fences to control access and to secure the property when it [is] not in operation. Public swimming pools are a prime example, as are dog parks. Controlled and limited access to swimming pools is, indeed, mandatory for safety reasons, but that does not make the swimming pool non "public." In short, a park or other facility will not lose its public character simply because access is limited or controlled either physically or by the imposition of a fee.

Tenn. Op. Atty. Gen. No. 15-63, 2015 WL 4711040 (July 29, 2015). For these same reasons, we conclude that the Fairgrounds is a recreational property subject to Tennessee Code Annotated section 39-17-1311 even though it is sometimes rented and/or closed to the public. As a recreational facility, the statute contemplates that the administrator of the Fairgrounds has authority to approve (or disapprove) of a gun show at the facility. *See* Tenn. Code Ann. § 39-17-1311(b)(1)(J)(iii) (permitting guns to be carried at gun shows on the recreational property "when the program has been approved by the administrator of the recreational building or property"). Accordingly, the Board did not run afoul of the preemption provision of Tennessee Code Annotated section 39-17-1314(a), which provides that the general assembly preempts the field of firearm regulation to the exclusion of metropolitan governments "[e]xcept as otherwise provided by state law." Making a decision to allow or disallow a gun show at a government-owned recreational facility is a power specifically recognized "by state law" pursuant to section 39-17-1311. It is not an unauthorized or preempted *de facto* local limitation on the transfer of firearms. The trial court's decision as to this issue is affirmed.

### C. The Metro Charter

In "Count II" of the complaint, Goodman alleged that the Board was not

10

authorized to ban gun shows at the Fairgrounds due to section 11.602(d) of the Metro Charter, which provides:

> All activities being conducted on the premises of the Tennessee State Fairgrounds as of December 31, 2010, including, but not limited to, the Tennessee State Fair, Expo Center Events, Flea Markets, and Auto Racing, shall be continued on the same site. No demolition of the premises shall be allowed to occur without approval by ordinance receiving 27 votes by the Metropolitan Council or amendment to the Metropolitan Charter.

Goodman asserted that he was regularly conducting gun shows at the Fairgrounds as of December 31, 2010, and therefore, gun shows were among the activities protected by the Charter provision. He asked the trial court to declare that the Charter provision precluded a gun show ban and to order Metro to make its facilities available for gun shows.

The trial court concluded that Goodman's claim must be dismissed because Goodman had "no private right of action to enforce the provisions of the Metro Charter." Specifically, the trial court found no mechanism for enforcing the Charter provision as it related to any specific activity, and no enforceable right to contract with Metro. The trial court concluded that the Metro Council was authorized to take appropriate steps against the Board if it deemed the Board's decision regarding gun shows to be in violation of the Metro Charter. Finding no basis for a private right of action, the trial court stated that dismissal was appropriate "on that basis alone."

The court went on to address the "number of other arguments" that were raised in Metro's motion to dismiss. As an alternative ground for dismissal, the trial court found that Goodman's substantive interpretation of the Charter provision was not supported by the language and intent of the Charter provision itself, which had been amended by voter referendum in 2011. The trial court noted that the Fairgrounds had "a long history" of operation for over three decades and that many people who participate in events there are "very protective of its existence." The trial court found that this sentiment was reflected by the passage of the charter amendment, as "[t]he voters desired that the types of activities that are mentioned in the Charter Amendment would continue, but they did not seek to restrict the Fair Board's ability to set the terms and conditions upon which those activities would be conducted." Goodman challenges both of these rulings on appeal.

### 1. Private Right of Action

"'A private right of action is the right of an individual to bring suit to remedy or prevent an injury that results from another party's actual or threatened violation of a legal requirement.'" *Hardy v. Tournament Players Club at Southwind, Inc.*, 513 S.W.3d 427,

433 (Tenn. 2017) (quoting *Wisniewski v. Rodale, Inc.*, 510 F.3d 294, 296 (3d Cir. 2007)). While some statutes and rules provide a private remedy by their express terms, others define legal duties but are silent about whether an individual may bring suit to enforce them. *Id.* The plaintiff bears the burden of establishing the existence of a private right of action. *Id.* at 434. When the statute or rule at issue does not expressly grant a private right of action, courts must examine the language of the provision and its legislative history to ascertain whether the legislative body intended to create an implied right of action.[4] *Id.* When discerning legislative intent, appropriate factors for consideration include:

> (1) whether the party bringing the cause of action is an intended beneficiary within the protection of the statute, (2) whether there is any indication of legislative intent, express or implied, to create or deny the private right of action, and (3) whether implying such a remedy is consistent with the underlying purposes of the legislation.

*Id.* at 435 (quoting *Brown v. Tenn. Title Loans, Inc.*, 328 S.W.3d 850, 855-56 (Tenn. 2010)). "[I]t is the legislative body that has the authority to create legal rights and interests and no right of action can be brought until there is legislative authority for that right of action." *Gillespie v. City of Memphis*, No. W2007-01786-COA-R3-CV, 2008 WL 2331027, at *9 (Tenn. Ct. App. June 5, 2008) (quotation omitted).

On appeal, Goodman does not analyze these factors or legal principles. Instead, he insists that "[t]here is no 'private right of action' issue in this case" to preclude the relief requested. Goodman contends that the question of whether a private right of action exists "relates solely to the issue of monetary damages." As such, Goodman claims that the trial court erred in dismissing his claims for declaratory judgment and injunctive relief (regarding the Metro Charter provision) due to the court's finding regarding the absence of a private right of action. Goodman asserts that "there is no need" for a private right of action and that the Tennessee Declaratory Judgment Act provides all the authority that is required for him to obtain the declaratory relief he sought. We disagree.

Tennessee appellate courts have considered whether a private right of action existed in a number of cases seeking a declaratory judgment and/or injunctive relief. In fact, earlier this year, the Tennessee Supreme Court affirmed the dismissal of a declaratory judgment action because the federal act that was allegedly violated did not provide a private cause of action that permitted the plaintiffs to enforce its provisions for their benefit. *West v. Schofield*, --- S.W.3d ---, No. M2015-01952-SC-RDM-CV, 2017 WL 1376946, at *16 (Tenn. Mar. 28, 2017). In *West*, inmates filed a declaratory

---

[4]*But see* Tenn. Code Ann. § 1-3-119 (effective July 1, 2012, providing that no court shall interpret a *statute* as *impliedly* creating a private right of action except as otherwise provided in that section).

judgment action alleging that the State's lethal injection protocol violated the federal Controlled Substances Act ("CSA"). *Id.* at *1. The trial court found that the inmates had "no cause of action" under the CSA and granted the defendants' motion for judgment on the pleadings. *Id.* at *14. The supreme court affirmed the dismissal and "reject[ed] their attempt to utilize the CSA in this context," noting that numerous courts had held that the CSA "does not provide a private cause of action which would permit the Plaintiffs to enforce its provisions for their benefit."[5] *Id.* at *16.

Other courts have also considered whether a private right of action existed to support claims for declaratory or injunctive relief. *See, e.g.*, *Am. Heritage Apartments, Inc. v. Hamilton Cnty. Water & Wastewater Treatment Auth.*, No. E2014-00302-COA-R3-CV, 2015 WL 399215, at *8-10 (Tenn. Ct. App. Jan. 30, 2015), *aff'd in part, rev'd in part* 494 S.W.3d 31 (Tenn. 2016) (concluding that a private right of action existed pursuant to the Tennessee Water and Wastewater Treatment Authority Act to permit the plaintiff's declaratory judgment action that the county water authority exceeded its authority by imposing a particular charge);[6] *Morrison v. City of Bolivar*, No. W2011-01874-COA-R9-CV, 2012 WL 2151480, at *2-10 (Tenn. Ct. App. June 14, 2012) (concluding that the Revenue Bond Law did not create an individual private right of action and therefore dismissal of the complaint seeking a declaratory judgment and other relief based on a violation of the statute was warranted); *State, ex rel. Deselm v. Tenn. Peace Officers Standards Comm'n*, No. M2007-01855-COA-R3-CV, 2008 WL 4614523, at *3 (Tenn. Ct. App. Oct. 16, 2008) (concluding that the appellants lacked standing to bring their action for declaratory judgment and additional relief based on an alleged violation of the Little Hatch Act because it did not provide for a private right action); *Gray v. City of Memphis*, No. W2004-00976-COA-R3-CV, 2005 WL 652786, at *1-3 (Tenn. Ct. App. Mar. 22, 2005) (concluding that a private right of action existed to enforce the Mail Order Statute, which the plaintiffs sought to enforce through a complaint for declaratory and injunctive relief); *Image Outdoor Advert., Inc. v. CSX Transp., Inc.*, No. M2000-03207-COA-R3-CV, 2003 WL 21338700, at *8 (Tenn. Ct. App. June 10, 2003) (affirming dismissal of a complaint for declaratory and injunctive relief because no private right of action existed to enforce the Tennessee Billboard Act).

We reject Goodman's insistence that the Declaratory Judgment Act provides an independent basis for him to allege a violation of the Metro Charter regardless of any issue regarding a private right of action. "'A litigant's request for declaratory relief does not alter a suit's underlying nature. Declaratory judgment actions are subject to the same

---

[5] "The terms 'private right of action' and 'private cause of action' are used interchangeably." *Hardy*, 513 S.W.3d at 433.

[6] Although the Tennessee Supreme Court later reversed in part, the supreme court adopted the court of appeals' reasoning and analysis on the issue of whether a private right of action existed. *Am. Heritage Apartments*, 494 S.W.3d at 52.

limitations inherent in the underlying cause of action from which the controversy arose.'" *Carter v. Slatery*, No. M2015-00554-COA-R3-CV, 2016 WL 1268110, at *6 (Tenn. Ct. App. Feb. 19, 2016), *perm. app. denied* (Tenn. Aug. 18, 2016), *cert. denied* 137 S. Ct. 669 (2017) (quoting 26 C.J.S. *Declaratory Judgments* § 124).[7]

In sum, we discern no merit in Goodman's assertion that the trial court erred in requiring a "private right of action" to support his claim for declaratory and injunctive relief regarding the Metro Charter. Because this issue is dispositive, Goodman's challenge to the trial court's alternative holding regarding the meaning of the Charter provision is pretermitted.

### D. The Motion to Amend

Finally, Goodman argues that the trial court erred in denying his motion to amend. The motion to amend was heard by a different chancellor after the original chancellor retired. As the trial court noted, the parties agreed that the motion to amend presented no new arguments or evidence. Instead, Goodman's motion to amend reasserted his previous arguments made in connection with the motion to dismiss regarding the issues of standing, a private right of action, and the Metro Charter. Goodman asked the trial court to "reconsider and amend" its order of dismissal resolving these issues in order to correct a clear error of law or to prevent injustice.[8] The trial court denied the motion on the basis that it simply sought to relitigate issues that were already adjudicated. On appeal, Goodman argues that the trial court erred in deeming his motion an improper attempt to relitigate the issues, and he claims that the trial court should have considered the merits of his motion to amend.

Having reviewed the trial court's order of dismissal and the substantive arguments raised by Goodman in the motion to amend and again on appeal, we find no clear error of law or injustice that would have entitled Goodman to the relief he sought in his motion to amend, *i.e.*, denial of the motion to dismiss. Therefore, even assuming for the sake of argument that a procedural error occurred, he is not entitled to reversal based on this issue. *See* Tenn. R. App. P. 36(b); *Mobile Home City, Inc. v. Dependable Ins. Co.*, No. 569, 1985 WL 4132, at *2 (Tenn. Ct. App. Dec. 6, 1985) (concluding that any error in failing to consider a second motion to amend was harmless as the plaintiff failed to raise

---

[7]As aptly noted by the Sixth Circuit, the absence of a private right of action "stops [the] declaratory judgment action in its tracks." *Michigan Corr. Org. v. Michigan Dep't of Corr.*, 774 F.3d 895, 907 (6th Cir. 2014). "No private right of action means no underlying lawsuit" and "no declaratory relief." *Id.*

[8]"The Tennessee Rules of Civil Procedure do not authorize motions to reconsider; such motions are often deemed by courts as motions to alter or amend the judgment pursuant to Rule 59.04." *Haynes v. Lunsford*, No. E2015-01686-COA-R3-CV, 2017 WL 446987, at *4 (Tenn. Ct. App. Feb. 2, 2017) (*no perm. app. filed*).

anything in his second motion that was not already addressed by the trial court and correctly ruled upon by the chancellor).

## V. CONCLUSION

For the aforementioned reasons, the decision of the chancery court is hereby affirmed and remanded. Costs of this appeal are taxed to the appellants, Tennessee Firearms Association, and International Gun-A-Rama, Inc. d/b/a Bill Goodman's Gun and Knife Show, and their surety, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE